**STATE**

v.

**Edward D. DiPRETE and Dennis L. DiPrete.**

**No. 97–167–C.A..**

Supreme Court of Rhode Island.

May 1, 1998.

Aaron Weisman, Assistant Attorney General, for Plaintiff.

Richard M. Egbert, R. Robert Popeo, Rosemary M. Allen, John K. Markey, Boston, MA, for Defendant.

Before WEISBERGER, C.J., LEDERBERG and BOURCIER, JJ., and MURRAY and SHEA, JJ. (Ret.).

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on an appeal by the state from a judgment of the Superior Court dismissing twenty-two counts of an indictment returned by a grand jury on March 24, 1994.[1] The indictment charged former Governor Edward D. DiPrete and his son Dennis L. DiPrete with multiple acts of bribery and extortion. The indictment also named certain unindicted coconspirators including Rodney M. Brusini, Frank N. Zaino, and Michael W. Piccoli. Also at issue in this proceeding was Mathies J. Santos, whom the trial justice found either to have been immunized or to have been granted letters of nonprosecution or promises of nonprosecution by representatives of the Attorney General. The judgment of dismissal was imposed as a sanction for delayed discovery by the state. We are of the opinion that in the circumstances of this case, the trial justice exceeded his authority in dismissing twenty-two counts of an indictment returned by a duly constituted grand jury. We therefore reinstate the counts and remand the case to the Superior Court for trial. The facts of the case insofar as pertinent to this appeal as found by the trial justice are as follows.

Following the indictment the parties entered into a stipulation on June 6, 1994, pursuant to which counsel for the state agreed to provide defendants with the testimony of prospective trial witnesses who appeared before any grand jury after 1991 if such testimony related to the subject matter of the instant indictment. Further the state agreed to provide defendants with written or recorded verbatim statements, signed or unsigned, made to investigators regardless of whether the person was expected to be a witness, other than those statements that were withheld on the basis of privilege. The state also agreed that if there were no written or recorded verbatim statements, summaries were to be provided, if available. Counsel for the state also agreed to make available to defendants all documents within the possession of the Department of the At-

torney General or the State Police that related to the subject matter of the indictment regardless of whether the state intended to introduce such documents as evidence at the trial. This stipulation recognized that the state would exclude mental impressions, conclusions, or opinions of investigators or attorneys and that such impressions, conclusions, or opinions could be redacted from documents that were provided. The stipulation did not preclude the filing of motions seeking further discovery or other pretrial relief by either party.

Pursuant to this stipulation the state produced over time approximately 600 boxes containing thousands of pages of documents that were generally relevant to the issues raised by the indictment. The 600 boxes of materials were provided during the years 1994 and 1995. On or about July 12, 1995, defendants filed fourteen motions for further discovery and for a bill of particulars. The state opposed certain of these motions on the ground that they exceeded defendants' right to discovery under Rule 16 of the Superior Court Rules of Criminal Procedure or the stipulation. Included among these motions was a request for exculpatory evidence pursuant to the doctrine enunciated by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. The trial justice held a hearing on August 24, 1995, and with the tacit consent of the state ordered with respect to all unindicted coconspirators

"a full and complete statement of all promises, rewards, and/or inducements made in order to secure their cooperation in the investigation; a full and complete statement of the State's knowledge of any and all criminal conduct of the unindicted coconspirators, including not only criminal convictions or pending criminal charges but also information on any known criminal conduct, whether or not that conduct had been the subject of a criminal charge; and any other information relating to a coconspirator's credibility as a witness such as prior inconsistent statements, ad-

---

1. The remaining two counts of the indictment alleging perjury were dismissed on June 25, 1997, and are not involved in this appeal.

missions of a poor memory, or evidence of bias on the part of the witness."

The court further ordered the state to produce similar materials in respect to any prospective witness as well as "any transcripts of grand-jury testimony by the witness[es] that was being withheld; and all notes of interviews with prospective witnesses taken by any agent of the state in the course of the investigation." The court ordered the notes to be produced for an in-camera review so that information relevant to ongoing investigations or otherwise privileged could be redacted. Although some of these requirements might arguably call for the disclosure of mental impressions, opinions, or conclusions on the part of counsel for the state, the orders were not appealed and therefore became the law of the case.

On November 10, 1995, defendants pressed a motion for exculpatory evidence presumably pursuant to the *Brady* doctrine. At that point counsel for the state asserted that the information required to be produced in the August 24, 1995 orders had been provided to the extent available. The state referred to previously produced immunity petitions and letters of nonprosecution. The trial justice later determined that these materials were inadequate to meet the full thrust of the discovery order.

At about that time the trial justice dismissed from the indictment all extortion-related charges. This order was appealed and subsequently reversed. *State v. DiPrete*, 682 A.2d 1373 (R.I.1996). Consequently a trial that was scheduled for May 13, 1996, in regard to the remaining counts was delayed. This ruling has no relevance to the instant appeal. It was merely referred to by the trial justice in his relation of the travel of the case.

On July 25, 1996, in the course of a conference call among attorneys for the state, attorneys for defendants, and the court, reference was made to certain materials that had not been disclosed by the state because of a claim of privilege. The trial justice then verbally ordered the state to produce all such materials for in-camera review by the court. In response to this order counsel for the state, as an alternative to producing documents for in-camera review, offered to allow defense counsel to review all the materials in the state's possession. This offer was accepted, and on July 29, 1996, representatives of the Attorney General's office produced thirty boxes of materials containing approximately 68,000 pages of documents that had previously been withheld by the state and which contained exculpatory evidence. The trial justice found in his decision that knowledge of the exculpatory evidence contained in the thirty boxes had been earlier denied by the prosecutors. He further found that the state had argued that there was nothing in the thirty boxes that defendants did not already have in some form or another.

Defense counsel examined the contents of the thirty boxes, which included, according to the state, preparatory notes of witnesses who had been interviewed in preparation for the trial scheduled for May 1996, which trial did not take place. Thereafter the state filed a supplemental response to defendants' motion for exculpatory evidence in which it set forth knowledge of criminal conduct (perjury) on the part of Rodney Brusini that had come to light subsequent to his testimony in March 1992 before a grand jury investigating activities of Joseph Mollicone, Jr. (Mollicone), and the Heritage Loan Company.

Defense counsel and their agents extracted eighty-nine exhibits from the thirty boxes of material that had been provided by the state. The trial justice found that the most important exhibits related to three unindicted co-conspirators, Rodney M. Brusini (Brusini), Frank N. Zaino (Zaino), and Michael W. Piccoli (Piccoli), who were all granted immunity or a letter of nonprosecution by the Department of the Attorney General, and to Mathies J. Santos (Santos), who was granted a promise of nonprosecution.

On the basis of these findings, defense counsel moved for sanctions, claiming that the information extracted from the materials provided on July 29, 1996, included information previously ordered to be produced on August 24, 1995. Counsel for defendants alleged that the extracted materials showed that the state knew Brusini had committed perjury in March of 1992, that he had filed

false documents with the State Ethics Commission, that he had committed tax fraud, that he had overbilled the state for work done, and that he had committed insurance fraud.

The defendants also alleged that the state had withheld evidence of knowledge of tax fraud on the part of Zaino, that attorneys for the state assisted Zaino in amending a 1991 state tax return and were aware that Zaino had filed a false affidavit concerning his financial affairs with the Rhode Island Family Court during divorce proceedings, and that he had maintained a secret bank account at Rhode Island Hospital Trust Bank in order to hide money from his wife during the pendency of their divorce. The defendants also claimed that the state was aware of other crimes committed by Zaino.

In respect to Piccoli the recently provided materials indicated that a representative of the Attorney General's office had sought lenient treatment at a sentencing hearing wherein Piccoli had pleaded guilty to defrauding the city of Cranston of an alleged sum exceeding $1 million. The defendants asserted that these materials indicated that the state recommended that Piccoli receive no jail time and make a restitution payment of only $135,000, significantly less than the amount he had fraudulently obtained. Counsel for defendants further claimed that the state knew of other criminal conduct that had been committed by Piccoli in connection with both construction projects for the Rhode Island Department of Transportation and his position at the Rhode Island Solid Waste Management Corporation.

In regard to Santos, defendants alleged in their motion for sanctions that the state knew that he had committed the crimes of bribery and extortion and had a conflict of interest in connection with his receipt of a $142,000 loan on favorable terms from Mollicone at a time when Santos as a state official was taking actions that benefited Mollicone. The defendants claimed that Santos was instrumental in obtaining a state agency as a tenant for a building owned by Mollicone and sought to obtain other tenancies that would benefit Mollicone. The defendants further claimed that the state's refraining from prosecution of Santos for bank fraud in connection with his loan application constituted a promise, reward, or inducement that should have been disclosed.

The state contended that all this information was available in other forms within the massive amount of discovery provided in the 600 boxes of materials furnished pursuant to the parties' stipulation and earlier orders of the court. The trial justice rejected the state's contentions and found, after the conclusion of a thirty-two-day evidentiary hearing, that counsel for the state had not fully complied with the orders of the court, Rule 16 of the Superior Court Rules of Criminal Procedure, the stipulation of the parties, and the *Brady* principles. He found that this withholding of information caused defendants to suffer substantive prejudice that warranted a remedy beyond a mere continuance. He found that the critical information had been gleaned from ten of the thirty boxes produced in July of 1996 and that most of the material came from the working files of former chief prosecutor Richard Ratcliffe, state investigator Peter Blessing, and State Police Sergeant Robert Mattos.

Although the court adverted to substantive prejudice that the delayed discovery had imposed upon defendants, his only specific finding in respect to prejudice is contained on page 31 of his decision. The court accepted the allegations of counsel for defendants that their inquiry into the content of the withheld documents and their requesting sanctions therefor caused them to reveal elements of their trial strategy to the prosecutors during this hearing by indicating exactly how the withheld material is exculpatory and how it would be used at trial to impeach the state's witnesses.

The defendants' counsel claimed that they were forced to surrender the element of surprise that is vital to effective cross-examination in their effort to ensure that their clients' constitutional rights to exculpatory information prior to trial be protected. The defendants argued to the court that this result, thrust upon them by prosecutorial misconduct, constituted substantive prejudice, which a continuance for any length of time could not cure.

The trial justice apparently accepted the arguments of defendants and summarized his holding in the following terms:

"Since the court has found that there has been a pattern of deliberate misconduct resulting in repeated violation of Super. Ct. R.Crim. P. 16, *Brady* principles, the stipulation between the parties, and the court's orders, all counts of the indictment except the severed counts 23 and 24 are dismissed."

## ANALYSIS

The arguments presented by the state in support of its appeal can be considered by analyzing three issues. First, the state contends that the *Brady* principles do not support the trial justice's drastic remedy of dismissal of twenty-two counts of the indictment. Second, the state argues that Rule 16 and the case law in interpretation thereof does not support the judgment of dismissal. Third, the state asserts that the Superior Court has no general supervisory power that would support the judgment of dismissal. We shall consider each of these contentions in turn.

### *Brady* Principles

The seminal case of *Brady v. Maryland, supra,* determined that the withholding of evidence favorable to the accused either in respect to the issue of guilt or the issue of appropriate punishment to be imposed at sentencing violated the guarantee of due process regardless of the good faith or the bad faith of the prosecution. 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. The remedy imposed upon the State of Maryland was the vacating of the sentence and the ordering of a new trial, which would be restricted to the question of punishment. *Id.* at 85, 83 S.Ct. at 1195, 10 L.Ed.2d at 217. Prior to *Brady,* the Court in *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), ordered a new trial in the light of evidence that false testimony had been presented at trial in regard to the reward or benefit accorded to a prosecution witness. The Court held that this false testimony constituted a denial of due process, entitling the defendant to a new trial if there was any

reasonable likelihood that the judgment of the jury could be affected. *Id.* at 272, 79 S.Ct. at 1179, 3 L.Ed.2d at 1223. A similar result was reached in *Giles v. Maryland,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), wherein evidence of a prior inconsistent statement of a rape victim was undisclosed.

In *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the *Brady* doctrine was extended to impeaching as well as exculpatory evidence that might be available to the accused. The Court held that failure to disclose such impeaching evidence when requested would constitute constitutional error only if it deprived the defendant of a fair trial. *Id.* at 676–78, 105 S.Ct. at 3380–81, 87 L.Ed.2d at 490–91. In that case the Court adopted a standard of materiality that would require a new trial only if the excluded evidence created "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494. A reasonable probability was defined as a probability sufficient to undermine confidence in the outcome. *Id.* The Court then remanded the case to the Court of Appeals for the Ninth Circuit to determine whether the materiality test had been met with the clear indication that if that question was answered in the affirmative, the remedy would be a new trial. *Id.* at 684, 105 S.Ct. at 3385, 87 L.Ed.2d at 495.

Earlier in *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 845–46, 51 L.Ed.2d 30, 42 (1977), a civil action brought under 42 U.S.C. § 1983, the Court pointed out that the *Brady* doctrine did not create a constitutional right to discovery. In that case the concealment of an undercover agent's role as a potential witness, although he was a codefendant (to protect his cover), did not constitute a denial of a fair trial. *Id.* at 560–61, 97 S.Ct. at 846, 51 L.Ed.2d at 42–43.

The most recent case under the *Brady* rubric was *Kyles v. Whitley,* 514 U.S. 419, 432–40, 115 S.Ct. 1555, 1565–69, 131 L.Ed.2d 490, 505–10 (1995), wherein the Court held that the government had a duty to disclose exculpatory evidence even in the absence of a request, if the withheld evidence considered

as a whole results in a reasonable probability that a different result would have obtained. The Court recognized that this obligation would exist regardless of the good faith or the bad faith of the prosecution and even if the police have failed to disclose the exculpatory evidence to the prosecuting attorney. *Id.* In that case there was a failure to disclose the fact that the defendant's car was not identified by a registration tag in the parking lot just after the incident. Moreover, the prosecution had introduced a photograph of the scene purporting to show the defendant's car. The government also withheld statements taken right after the incident that were entirely contrary to the testimony given at the trial. There was also a failure to disclose that the eyewitnesses who identified the defendant as the killer had given descriptions inconsistent with their testimony at trial; their earlier statements to police describing more closely another person who was connected with the crime. *Id.* at 441–51, 115 S.Ct. at 1569–74, 131 L.Ed.2d at 510–16. In that case, the Court held that the materiality test had been met and ordered as a remedy the reversal of the conviction and a remand for a new trial. *Id.* at 442, 115 S.Ct. at 1560, 131 L.Ed.2d at 498.

Numerous other cases might be cited expressing similar rationales in application of the *Brady* doctrine. *See, e.g., United States v. Agurs,* 427 U.S. 97, 112–14, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342, 354–56 (1976) (materiality standard enunciated but no new trial ordered because there was no sustainable inference of perjury); *Giglio v. United States,* 405 U.S. 150, 151–52, 92 S.Ct. 763, 764–65, 31 L.Ed.2d 104, 106–07 (1972) (ordering new trial where promise of leniency to a government witness not disclosed).

Our Rhode Island implementation of the *Brady* principles was first enunciated in *In re Ouimette,* 115 R.I. 169, 342 A.2d 250 (1975). In that case after a comprehensive survey of the cases preceding and subsequent to *Brady,* this Court adopted a rationale enunciated in *United States v. Kahn,* 472 F.2d 272, 287 (2d Cir.1973), in which the court suggested that a defendant "must show there is a significant chance that the use and development of the withheld evidence by

skilled counsel at trial would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Ouimette,* 115 R.I. at 179, 342 A.2d at 254–55. This test was adopted for determining whether a conviction should be set aside for the withholding of exculpatory evidence in circumstances in which the withholding was nondeliberate. The Court then remanded the case to the Superior Court in order to determine whether the legal principles enunciated would warrant a new trial. *Id.* at 181, 342 A.2d at 256. In *State v. Wyche,* 518 A.2d 907, 911 (R.I. 1986), we expressed the principle that a deliberate withholding of evidence by the prosecution would entitle the defendant to a new trial without the necessity of establishing prejudice. This rule was applicable pursuant to the *Brady* doctrine as well as Rule 16.

All the foregoing cases indicate beyond doubt that the *Brady* principles have no relevance to pretrial discovery. Under *Brady* the denial of due process is ripe for consideration only in the event that an accused has been convicted of an offense in circumstances in which the nondisclosure of exculpatory or impeaching evidence was deliberate or, when viewed in the context of the totality of the state's proof in the case, would have a material effect upon the outcome or would create a significant chance that such exculpatory or impeaching evidence in the hands of skilled counsel would have created a reasonable doubt in the minds of the jurors. In sum the *Brady* doctrine creates a posttrial remedy and not a pretrial remedy and is therefore not relevant to the issues raised by this appeal.

### Rule 16 – Discovery

In all the Rhode Island cases cited by the state and by defendants save one that will be considered later, the issue presented to the Court was whether discovery violations would warrant the reversal of a conviction and the ordering of a new trial. Such a new trial was ordered for failure to disclose an incriminating statement by the defendant in *State v. Darcy,* 442 A.2d 900, 903 (R.I.1982). A similar remedy was provided for nondisclosure in *State v. Verlaque,* 465 A.2d 207, 212–14 (R.I.1983), wherein the state furnished

defense counsel with the names of fifty-three witnesses on the eve of trial without summarizing their testimony, in clear violation of the motion for discovery. Similarly in *State v. Coelho*, 454 A.2d 241 (R.I.1982), a new trial was ordered because of the trial justice's refusal to grant a continuance in the light of the failure of the state to complete the furnishing of discovery material until the eleventh hour. In that case we pointed out that the trial justice could have mitigated the obvious prejudice caused to this defendant by granting a continuance. *Id.* at 246. In *State v. Brisson*, 619 A.2d 1099 (R.I.1993), the defendant moved to dismiss the indictment on the basis of prosecutorial misconduct. The alleged misconduct consisted of the prosecutor's nondisclosure of redacted sections of records of the Department of Children and Their Families (DCF). *Id.* at 1102. This nondisclosure was in violation of an order of a justice of the Superior Court that required the production of these records in a case involving a charge of first-degree sexual assault. This Court concluded that the redacting of the DCF records amounted to inadvertent nondisclosure and, referring to the four-part test contained in *State v. Coelho, supra*, denied the relief requested by the defendant, even assuming arguendo that there was negligence or bad faith on the part of the prosecution. *Brisson*, 619 A.2d at 1103–04. The relief was denied because the defendant failed to demonstrate prejudice. *Id.* The analysis in *Brisson* more or less combined the *Brady* principles and the *Coelho* doctrine relating to a Rule 16 violation. The Court reenunciated the *Coelho* factors as follows:

> "The trial justice should consider '(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors.'" *Brisson*, 619 A.2d at 1102 (quoting *Coelho*, 454 A.2d at 245).

A motion for new trial for discovery and/or *Brady* violations was granted in *State v. Wyche*, 518 A.2d at 910–11, for failure to provide the results of a blood test showing the alcohol content of the complaining witness that would have been of assistance to the defense and in the light of deliberate nondisclosure by the prosecution. A new trial was granted in *State v. Evans*, 668 A.2d 1256, 1260 (R.I.1996), for unintended nondisclosure of promises made to the sole prosecution witness in exchange for his testimony. The foregoing cases indicate that the remedy for deliberate or negligent violation of discovery orders has generally been the vacating of a conviction and the ordering of a new trial.

It is of extreme importance in the case at bar to recognize that this is delayed discovery, not denied discovery. In all the cases in which this Court has ordered a new trial for discovery rule violations or failures, the defendants were subjected to greater disadvantages than were defendants in the case at bar in that they were required to undergo a trial and a determination of guilt. Nevertheless, the remedy of a new trial was considered adequate and appropriate by this Court.

However, in *State v. Quintal*, 479 A.2d 117 (R.I.1984), the trial justice did dismiss an indictment in unique circumstances for failure to obey an order of the Superior Court. *Id.* at 118. In that case the defendant was charged with third-degree sexual assault. He had sought discovery pursuant to Rule 16 of medical reports pertaining to the mental health and gynecological history of the complaining witness. The motion was granted by the trial justice on November 9, 1981. On January 8, 1982, defense counsel filed a motion to dismiss the indictment on the ground that the state had failed to comply with the discovery order. The motion to dismiss was not heard until June 25, 1982. In the interim some records had been provided, but clearly the records were not complete. At the hearing a justice of the Superior Court treated the defendant's motion to dismiss as a motion to compel production and granted it. This order was entered July 1, 1982. 479 A.2d at 118.

The state subsequently produced some additional records but did not completely satisfy the orders of November 9, 1981, and June 25, 1982. At a pretrial conference on November 23, 1982, the trial justice ordered the state to produce the psychiatric records requested by defense counsel. The justice entered a conditional sixty-day order, specifying that if the state failed to comply with the

court's command, the case would be automatically dismissed with prejudice. *It is important to note that the state agreed to the entry of this conditional order.* The order was entered on November 30, 1982, setting January 24, 1983, as the deadline for compliance. *Id.* at 118.

The state failed to provide the materials ordered within the time limited by the conditional order. The Superior Court justice granted a motion to dismiss on January 26, 1983. Thereafter the state moved to vacate the order of dismissal. *Id.* at 118. The motion to vacate was denied. *Id.* at 119. This Court upheld the denial to vacate the dismissal. In so doing, we stated that "[a]bsent enforcement of such self-executing orders, 'the sanctions would have no meaning, and parties would be allowed to ignore the discovery rules and orders issued pursuant to them.'" *Id.* at 120 (quoting *State v. DiPrete,* 468 A.2d 262, 265 (R.I.1983)).

The trial justice in the case at bar relied heavily upon *State v. Quintal* in determining that he had the authority to dismiss twenty-two counts of the subject indictment. With this interpretation we must respectfully disagree. We believe that *State v. Quintal* cannot be extended beyond the particular facts upon which it was based. In that case the conditional order of dismissal, to which the state agreed, requiring the production of certain defined and discrete materials was, as we suggested, self-executing. *Quintal,* 479 A.2d at 120. The state's failure to comply with such an order could have but one result, namely, the implementation of the condition of the order, entry of final judgment.

In the case at bar we accept the trial justice's findings that the state failed to comply with the discovery order that required disclosure of the state's knowledge of criminal conduct engaged in by its principal witnesses, Brusini, Zaino, Piccoli, and Santos, until the furnishing of the thirty boxes of material on July 29, 1996. We further accept

the trial justice's finding that the state was not completely forthcoming in detailing its agreements not to prosecute Brusini, Zaino, Piccoli, and Santos for various criminal activities until the material was provided on July 29, 1996. We are also mindful that additional discovery was provided during the thirty-two-day hearing on the motion for sanctions. We also take into account the fact that the trial justice authorized subpoenas purportedly pursuant to Rule 17(c) of the Superior Court Rules of Criminal Procedure. These subpoenas, as disclosed in subsequent depositions, enabled counsel for defendants to obtain significant additional information, some of which may not have been known to the state.

Consequently, prior to the conclusion of the sanction hearings, counsel for defendants had all the information that they had requested in their supplemental motions for discovery that had been granted on August 24, 1995. In this posture the trial justice was constrained in determining sanctions to consider the four-part test set forth in *State v. Coelho.* Without question he determined that the failure of complete discovery was deliberate. He then considered whether a continuance would be sufficient to cure the discovery violations and found that it was not. He also considered whether there had been prejudice to defendants and the feasibility of rectifying that prejudice by continuance. We recognize that in the context of the granting of a new trial, the *Coelho* doctrine does not require that prejudice be shown when nondisclosure by the prosecutor is deliberate. *See State v. Garcia,* 643 A.2d 180, 187 (R.I.1994); *Wyche,* 518 A.2d at 911. *Coelho* and the cases in interpretation thereof, however, do not address the criteria for dismissal of an indictment. The sole prejudice specifically found by the trial justice was that the defense counsel were forced, in moving for sanctions, to disclose their strategy. We think this prejudice is insufficient.[2]

---

**2.** We observe that Rule 16(i) of the Superior Court Rules of Criminal Procedure, which provides sanctions for failure to comply, does not include dismissal as a sanction. The rule states that in such circumstances "it [the court] may order such party to provide the discovery or inspection, grant a continuance, or prohibit the

party from introducing in evidence the material which or testimony of a witness whose identity or statement were not disclosed, or it may enter such other order as it deems appropriate."

In expressing the applicable sanctions, Rule 16(i) differs markedly from Rule 37 of the Supe-

The disclosure of the defense strategy was brought about not by the delay in discovery but by defendants' voluntary actions in seeking sanctions. When the material produced in the thirty boxes plus the fruits of the Rule 17(c) subpoenas were made available to defendants, the state had provided all materials that defendants had requested. The defendants could have used these materials to prepare for trial. However, defendants chose to seek the ultimate sanction of dismissal. It was in pursuance of this goal that their strategy was disclosed. Moreover, we are of the opinion that the disclosure of this strategy was of minimal prejudice since it would be apparent to any skilled advocate that impeaching materials relating to criminal conduct and/or promises and rewards would be utilized by defendants to the greatest extent possible in cross-examination. It should also be noted that under our liberal rules of discovery, see *Wyche*, 518 A.2d at 910 (recognizing that Rule 16 is one of the "most liberal criminal discovery mechanisms in the United States"), defendants' strategy is no more beyond disclosure than is the strategy of the state. Trial by ambush is no longer available to either side.

Consequently we are of the opinion that the sanctions available to the trial justice included neither that of excluding the testimony of the state's witnesses nor the ultimate sanction of dismissal. The trial justice observed in his decision that he could not be sure that all discovery had been provided even at the close of the hearing. Under the provisions of Rule 16(i) the trial justice had ample authority to preclude any evidence that might be offered at trial that had not already been provided pursuant to the aggressive steps taken by counsel for the defense and implemented by the court.

In the event that the trial justice was of the opinion that defendants were required to expend additional resources in order to achieve full discovery, the court might have awarded an appropriate counsel fee for such additional time as might have been spent in seeking full discovery.

However, in the circumstances of this case it is the opinion of this Court that the trial justice did not have the authority to dismiss twenty-two counts of this indictment. We are not testing this order under an abuse-of-discretion standard. We hold to the contrary that there was an insufficient basis upon which the trial justice could enter an order of dismissal. Therefore, his discretion in this context was not called into action. We are of the opinion that only in extraordinary circumstances such as were present in *State v. Quintal* would a trial justice have the authority to dismiss an indictment for delayed discovery. Those circumstances were not present in this case.[3]

rior Court Rules of Civil Procedure which specifically authorizes the court to dismiss a plaintiff's claim or to default a defendant if an order compelling discovery is not complied with within a specified time frame. Although the catchall provision of Rule 16(i) is suggested by defendants to include the power of dismissal, we would suggest that such strong medicine as dismissal should seldom be utilized when a less drastic sanction would secure obedience to the court's orders. Federal courts of appeal have enunciated and followed these principles. *See, e.g., United States v. Dennison*, 891 F.2d 255 (10th Cir.1989); *United States v. Jacobs*, 855 F.2d 652 (9th Cir.1988); *United States v. White*, 846 F.2d 678 (11th Cir. 1988). In *Jacobs* the court stated:

"Because the drastic step of dismissing an indictment is a disfavored remedy, *United States v. Rogers*, 751 F.2d 1074, 1076–77 (9th Cir.1985), a district court may properly dismiss an indictment only if the prosecutorial misconduct (1) was flagrant, *United States v. Carrasco*, 786 F.2d 1452, 1455 (9th Cir.1986), and (2) caused substantial prejudice to the defendant. *Rogers*, 751 F.2d at 1077. In cases involving prosecutorial misconduct which is neither flagrant nor prejudicial, a district judge can still sanction the misconduct, but the sanction chosen must be proportionate to the misconduct." *Jacobs*, 855 F.2d at 655.

3. In the course of his dissent, our brother, Justice Bourcier, asserts that we have been unable to find any abuse of discretion on the part of the trial justice in this case. Since our opinion clearly states that he had no authority to dismiss twenty-two counts of this indictment based upon the factual context presented to him, we held that his discretion was not called into action. Consequently, we had no reason to seek to determine whether there was an abuse of a discretion that we believed did not exist in these circumstances.

Our brother also emphasizes the significance of the case of *State v. Rawlinson*, 526 A.2d 1278 (R.I.1987). This per curiam opinion sheds little light on the issues that were previously presented to this Court. In that case a justice of the Superior Court had dismissed an information for

Supervisory Power

The defendants have asserted that the Superior Court, like Federal District Courts, has an inherent supervisory power that would enable justices of the Superior Court to take such actions as may be necessary to vindicate their authority, even though such actions may not be specifically authorized by constitution or rule. We concur with the general proposition that justices of the Superior Court have inherent power to govern proceedings before them and to vindicate their authority by appropriate sanctions including the sanction of contempt.

However, the Supreme Court of the United States, which recognizes the supervisory authority of Federal District Courts also limits that authority within appropriate parameters. For example, in *United States v. Hasting*, 461 U.S. 499, 505–07, 103 S.Ct. 1974, 1978–79, 76 L.Ed.2d 96, 104–05 (1983), the Supreme Court cautioned that the court's supervisory power was improperly exercised as a means of disciplining prosecutors for error that was not prejudicial to the defendants. In that case the Court of Appeals for the Seventh Circuit had reversed a conviction for prosecutorial misconduct in violating the Fifth Amendment rights of the defendant and declined to apply the harmless-error rule. *Id.* at 503, 103 S.Ct. at 1977, 76 L.Ed.2d at 102–03. The Supreme Court admonished the court below that "reversals of convictions under the court's supervisory power must be approached 'with some caution,' * * * and with a view toward balancing the interests involved." *Id.* at 506–07, 103 S.Ct. at 1979, 76 L.Ed.2d at 105. A fortiori the supervisory power exercised in dismissing an indictment must be exercised with maximum caution. Earlier, in *United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510, 514–15 (1966), the Court reversed the dismissal of an indictment by a District Court on the ground that the government had acquired incriminating evidence in violation of the Fifth Amendment. The Court held that the sanction of dismissal went too far, even if one assumed that there had been a violation of the Fifth Amendment. The Court suggested that although exclusionary rules might bar the admission of testimony obtained in violation of constitutional safeguards, the remedy does not extend to barring the prosecution altogether. *Id.* The Court suggested that such a drastic step would "increase to an intolerable degree interference with the public interest in having the guilty brought to book." *Id.* at 255, 86 S.Ct. at 1419, 16 L.Ed.2d at 515.

In *United States v. Payner*, 447 U.S. 727, 730–31, 100 S.Ct. 2439, 2443–44, 65 L.Ed.2d 468, 473 (1980), a federal district judge who was outraged by prosecutorial misconduct in violating the Fourth Amendment rights of a person not before the court exercised supervisory power to exclude the use of evidence obtained by this misconduct against the defendant. The Supreme Court made it clear

persistent failure by the state to produce a copy of a search warrant and certain statements of anticipated state witnesses although ordered by the justice to do so on more than one occasion with specific time limits expressed for compliance. It should be noted that within days of the dismissal the state filed a new information against the same defendant. Subsequent to filing the new information the state purported to appeal the dismissal of the first information. The defendant moved for dismissal of the second information before the justice who had entered the order of dismissal in respect to the first information. This motion was denied. Thereafter, the state's appeal from the dismissal of the first information was apparently withdrawn. The defendant was then tried, convicted, and appealed asserting that the dismissal of the first information precluded trial on the second information. In response to this appeal we issued the unpublished order to which our brother alludes in his dissent.

The somewhat convoluted and confusing history of the *Rawlinson* case should not expand its significance beyond the narrow issue it presented. The sole question before us at that time was whether the initial information had been dismissed with prejudice. We remanded the case so that the trial justice could make that determination. In any event, the appropriateness of the dismissal of the first information was never presented to us in an adversary context.

Consequently this case is a weak reed upon which to base a sweeping statement that this court has long recognized the discretionary authority of a trial justice to dismiss either an indictment or an information save under the most extraordinary and compelling circumstances that were not presented in the case at bar. All other Rhode Island cases cited, save *Quintal*, dealt only with issues of motions for mistrial, new trial, or the exclusion of evidence, as we have pointed out elsewhere in this opinion.

that the defendant could complain only about violation of his own Fourth Amendment right and that the supervisory power could not be used to create an exclusionary rule. *Id.*

This Court cited *United States v. Payner* in *State v. Jackson*, 570 A.2d 1115, 1116–17 (R.I.1990) (per curiam), when we declined to be persuaded by the decision of the Federal District Court of Rhode Island that created its own exclusionary rule barring admissibility of records for a violation of G.L.1956 § 12–1–12 in the context of a civil rights action. We held that a court had no supervisory power to create an exclusionary rule not authorized by the Legislature. 570 A.2d at 1116–17.

In *United States v. Santana*, 6 F.3d 1, 9–11 (1st Cir.1993), Federal Circuit Judge Selya reviewed the supervisory power that was used to dismiss a count of the complaint for a purported violation of the due-process clause relating to a third person. He suggested that the supervisory power should be used sparingly. *Id.* He further suggested that pursuant to *Payner; United States v. Hasting, supra,* and *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), federal courts should refrain from using the supervisory power to make executive conduct conform to judicially preferred norms by dismissing charges absent a cognizable prejudice to a particular defendant. 6 F.3d at 11.[4]

■ Thus it appears in federal jurisprudence that the use of supervisory power would not permit a court in the federal system to create exclusionary rules not otherwise constitutionally authorized or to dismiss indictments in the absence of both outrageous conduct and demonstrable and otherwise incurable prejudice. Our opinion in *State v. Jackson, supra,* would indicate that this Court would also hold the supervisory power within similarly narrow limits. When we refer to an exclusionary rule as strong medicine, we would certainly regard dismissal of an indictment or numerous counts thereof to constitute even stronger medicine that would necessarily rest on a constitutional, statutory, or other imperative created by a court rule rather than the inherent supervisory power.

We recognize that the trial justice in the case at bar reached a conscientious determination that the remedy of dismissal was authorized by our opinion in *Quintal.* Our limiting of the holding in that case to its particular facts will serve as a guide to trial justices in reserving the extreme and ultimate sanction of dismissal only to situations in which there has been flagrant prosecutorial misconduct accompanied by severe and incurable prejudice. During the course of the trial justice's thirty-two-day hearing and in his comprehensive and careful findings of fact set forth in his written decision, it is apparent that he was justifiably displeased at the state's conduct of its discovery obligations. Failure to communicate effectively among the members of the Attorney General's staff, reliance upon the assumption that prior members of the prosecutorial team had conducted exhaustive searches of documents, and failure to express with full candor the knowledge of criminal conduct on the part of significant witnesses brought forth appropriate critical comment from the trial justice.

We must bear in mind that when a grand jury returns an indictment, the people of the State of Rhode Island are entitled to have the issues of fact and the issues of guilt or innocence tried on their merits. The punishment of an errant prosecutor by dismissal of the charges is in effect a punishment imposed upon the people of this state. Only in the most extraordinary of circumstances should the people of Rhode Island be deprived of their right to a trial of these charges.

For the reasons stated, the appeal of the state is sustained. The judgment of the Superior Court dismissing twenty-two counts of the indictment is hereby vacated. The case

---

4. We recognize that the cases cited are distinguishable on their facts from the case at bar. Nevertheless they do indicate a strong line of authority established by the Supreme Court of the United States and the Federal Courts of Appeal to the effect that the supervisory power cannot create new rules of exclusion or dismissal in the absence of a constitutional or statutory basis for such a ruling.

is remanded to the Superior Court for trial on the merits.——

FLANDERS and GOLDBERG, JJ., recused themselves from participation in this case.

LEDERBERG, Justice, concurring in part and dissenting in part.

I concur with the majority in remanding this case for a trial on the merits. I dissent, however, in two respects. First, it is my opinion that the majority has erred by "not [reviewing] this order under an abuse of discretion standard;" second, the majority errs in failing to impose sanctions for what both the majority and the dissent agree were flagrant abuses of the discovery process.

I disagree with the majority's signal conclusion that "the trial justice did not have the *authority* to dismiss twenty-two counts of this indictment." (Emphasis added.) The dissent, correctly I believe, points out that Rule 16 of the Superior Court Rules of Criminal Procedure clearly grants to a trial justice the authority to dismiss an indictment in appropriate circumstances. Rule 16(i) explicitly provides that

> "[i]f at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, [the court] may order such party to provide the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material which or testimony of a witness whose identity or statement [was] not disclosed, or *it may enter such other order as it deems appropriate.*" (Emphasis added.)

The majority errs in disavowing this Court's long-standing practice of applying an abuse-of discretion standard when reviewing a trial justice's imposition of sanctions, including dismissal, for discovery violations. *See, e.g., State v. St. Jean,* 554 A.2d 206, 210 (R.I.1989); *State v. Ramos,* 553 A.2d 1059, 1068 (R.I.1989); *State v. Quintal,* 479 A.2d 117, 119 (R.I.1984); *State v. Verlaque,* 465 A.2d 207, 213 (R.I.1983).

In applying the heretofore unquestioned abuse-of-discretion standard, I conclude that the dismissal of the twenty-two counts of the indictment was an abuse of the trial justice's discretion in this case. In discussing the imposition of sanctions for discovery violations, the federal courts have identified three factors that trial justices must consider in exercising their discretion in respect to sanctions.

> "These include: (1) the reasons for the government's delay in producing the materials, including whether it acted intentionally or in bad faith; (2) the degree of prejudice, if any, to the defendant; and (3) whether the prejudice to the defendant can be cured with a less severe course of action, such as granting a continuance or a recess." *United States v. Maples,* 60 F.3d 244, 247 (6th Cir.1995).

*See also United States v. Hastings,* 126 F.3d 310, 317 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1388, 140 L.Ed.2d 648 (1998); *United States v. Wicker,* 848 F.2d 1059, 1061 (10th Cir.1988). The third prong of this well-reasoned test has been interpreted to require a trial justice to impose the least severe sanction that will cure the prejudice in order to achieve the required remedial effect.

Although this Court has never explicitly adopted the "least severe sanction necessary" doctrine of the federal courts, the rule comports with our prior case law. For example, in *State v. Silva,* 118 R.I. 408, 412, 374 A.2d 106, 109 (1977), we reversed a judgment of conviction and held that the trial court abused its discretion in excluding the defendant's alibi testimony. The trial justice had excluded the alibi testimony as a sanction for the defendant's noncompliance with his obligations under Rule 16(c). In reversing the trial justice, we concluded that "the circumstances certainly did not justify the extreme action taken by the trial justice," and the case was remanded for a new trial. *Id.* at 411, 412, 374 A.2d at 108, 109. In *State v. Darcy,* 442 A.2d 900 (R.I.1982), we vacated the defendant's convictions of driving to endanger, death resulting, and held that the requested mistrial should have been granted because the trial justice admitted into evidence "a highly prejudicial statement made

by the defendant, although the state had not disclosed the existence of that statement in response to the defendant's request for discovery." *Id.* at 901. In so holding, we observed that "[t]he imposition of any Rule 16 sanction is a matter within the sound discretion of the trial justice. * * * *If no other available discretionary measures can possibly neutralize the harmful effect of improperly admitted evidence,* then a *mistrial* should be declared." *Id.* at 902. (Emphases added.)

Under the least-severe-sanction-necessary rule, a dismissal for discovery violations would be upheld on appeal only if the defendant has suffered *incurable* prejudice. Although defendants in this case made such an allegation, the trial justice made no express finding of incurable prejudice. Rather, the trial justice, rightly concerned about deterring future prosecutorial misconduct, chose to dismiss the charges. Although the trial justice had evaluated sanctions less severe than dismissal, he rejected them after concluding that less drastic sanctions would do "nothing to impress upon the prosecution that it cannot be allowed to benefit from having acted in a manner that is less than constitutional and ethical in the pursuit of convictions." Such a concern is a noble one but is neither sufficient, standing alone, to justify dismissal, nor the least severe remedy available under the test articulated above to cure the prejudice suffered by defendants. Accordingly, I conclude that the trial justice abused his discretion in dismissing the indictments, and I would sustain the state's appeal on that basis.

The trial justice pointed out in his decision one claim of incurable prejudice made by defendants.

"Defendants claim that they have been forced to surrender the element of surprise, which is vital to effective cross-examination, in an effort to ensure that their clients' constitutional rights to exculpatory information prior to trial be protected. The defendants argue that this result, thrust upon them by prosecutorial misconduct, constitutes substantive prejudice which a continuance for any length of time cannot cure."

The trial justice, however, made no finding that he agreed with this defense argument. Even were the trial justice to make such a finding upon the remand of this case, dismissal is not the least severe remedy available to rectify the situation. Under Rule 16, the testimony of witnesses implicated by prior prosecutorial misconduct could be limited or excluded, within the discretion of the trial justice, so that the playing field is once again level. *See* Super. R.Crim. P. 16(i) ("If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, it may * * * prohibit the party from introducing in evidence the material which or testimony of a witness whose identity or statement were not disclosed."); *see also State v. Gomes,* 690 A.2d 310, 319 (R.I.1997) (concluding that trial justice did not abuse his discretion in precluding defendant's witnesses from testifying when the defendant had failed to comply with rules of discovery); *State v. Engram,* 479 A.2d 716, 719 (R.I.1984) (same).

Whenever a party has failed to comply with the requirements of Rule 16, resulting in the withholding of information incontrovertibly essential to the opposing party in carrying out effective cross-examination of witnesses, the sanction of testimony or witness exclusion is appropriate. Here the prosecution apparently immunized witnesses, entered into nonprosecution agreements, took other active steps to sanitize state witnesses, and then deliberately withheld this information from defendants. The failure to sanction this tactical withholding renders nugatory the avowed purpose of Rule 16 "to ferret out *procedural* * * * prejudice." *State v. Coelho,* 454 A.2d 241, 245 (R.I.1982). Because of the state's efforts on its witnesses' behalves, one can reasonably surmise that those witnesses became sufficiently indebted to the prosecution to become transformed, in essence, into blank slates upon which the state could write the story of its choice. Certainly a trial justice would be acting within his or her discretion in excluding the testimony of those witnesses entirely.

The solicitude that both the trial justice and my dissenting colleague have shown for the rights and protections of defendants is warranted. The majority apparently accepts the trial justice's findings of fact *in toto*, along with the disquieting picture of prosecutorial misconduct painted by those facts. Equally troubling, however, is an outcome permitting such conduct to go unsanctioned. Although the resources available to defendants here were instrumental in uncovering the state's wrongdoing, most defendants are unable to engage in protracted discovery battles. "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S.Ct. 585, 591, 100 L.Ed. 891, 899 (1956) (Black, J.).

The prosecution's behavior in this case amounted to a fraud on the court that might never have been discovered but for the zealous efforts of defendants' attorneys. The trial justice found that "the prosecutors acted deliberately with the intent to mislead the defendants and the court." At the very least, the prosecutors' conduct in this case showed a reckless disregard for the government's obligations to comply with the rules and orders of the Superior Court and "to take no steps that prevent an adversary from presenting his case fully and fairly." *Demjanjuk v. Petrovsky*, 10 F.3d 338, 354 (6th Cir.1993). In *Demjanjuk* the Court of Appeals for the Sixth Circuit took the unusual step of reopening a case on the court's own motion and then vacating a prior judgment on the basis of prosecutorial misconduct by attorneys of the federal government. Observing that "[n]o court system can function without safeguards against actions that interfere with its administration of justice," the Sixth Circuit insisted that "[a]s an officer of the court, every attorney has a duty to be completely honest in conducting litigation." *Id.* at 352.

As a result of the prosecutors' misconduct, the defendants here have suffered prejudice, additional attorneys' fees, expenses in countering that misconduct, and delay in bringing their case to a resolution. Although the delay caused by the dismissals and subsequent appeal may have had a curative effect by allowing the defendants time to incorporate into their defense the materials contained in the delayed discovery, that benefit has come only at considerable cost to the defendants. The state, however, should not be permitted to benefit from the delay. Accordingly, it is my opinion that the state should be precluded from using at trial any evidence discovered subsequent to May 16, 1996, the date on which this Court issued its order vacating the trial court's dismissal of the extortion counts. Furthermore, an award of attorneys' fees should be made to compensate the defendants for the financial burdens that they would not have borne but for the state's delay in producing the additional materials.

BOURCIER, Justice, dissenting.

If for a moment I could believe that the defendants had not been irreparably prejudiced by the state's prosecutorial misconduct and could get a fair trial, I would join with my colleagues in the majority. I cannot, however, and for that reason as well as for the unconventional method chosen by my colleagues to review the state's appeal, I am unable to join in their opinion.

Until this case, in every appeal that has come to this Court challenging the imposition of a Super.R.Crim.P. 16(i) discovery violation sanction by a trial justice, we have steadfastly held that choice of sanction is a matter that is left to the sound discretion of the trial justice and, absent a showing by the appellant of a clear abuse of that discretion, this Court will not overturn the trial justice's action. The majority, unable to find any abuse of discretion on the part of the trial justice in this case, has supplanted without reason that established precedent with a new and novel "lack of authority" review rule that it says precluded the trial justice's imposition of either of two long recognized Rule 16(i) sanctions, witness exclusion and case dismissal. In doing so, I believe that the majority misconceives and mischaracterizes the flagrant and intentional misconduct of the state's prosecutors and fails to recognize the substantial prejudice to the defendants that the prosecutors' misconduct caused.

If the evidence of the iniquitous prosecutorial chicanery present in this case record,

coupled with its resulting prejudice that has deprived the defendants of their right not only to a speedy but to a fair trial as well is, as the majority today holds, insufficient to warrant the discretionary sanction imposition of either dismissal or witness exclusion, then no case facts reasonably imaginable will ever satisfy the majority of the availability and propriety of those sanctions in the future. What is particularly troubling to me in the majority's opinion is not only that it abandons what has been our long-standing rule of appellate review applied in every case in which we have been called upon to review a trial justice's discretionary imposition of Rule 16(i) remedial sanctions but it also effectively reduces the supervisory role of a Superior Court trial justice in Rule 16 discovery proceedings to that of a casual spectator at a sporting event. I believe that what the majority does today mortally wounds Rule 16 and serves only to *encourage* rather than to *discourage* similar prosecutorial misconduct in the future. I refuse to be one of the Rule's pallbearers. Accordingly I must respectfully dissent and offer in support of my position my reasons for doing so.

# I

## Prosecutorial Misconduct— Rule 16(i) Sanctions

Some four years ago, on March 24, 1994, a state grand jury returned an indictment against the defendants in this case, alleging, inter alia, that both had conspired between 1985 and 1990 to engage in criminal bribery and extortion to acquire money and election campaign contributions, using as inducement the awarding of state leases and contracts. They were arraigned on that indictment in April 1994 and pled not guilty.

The state's charges, some dating as far back as thirteen years, to 1985, appear to be grounded upon the recollections of four expected key state trial witnesses, Rodney M. Brusini (Brusini), Frank N. Zaino (Zaino), Michael W. Piccoli (Piccoli), and Mathias J. Santos (Santos). The first three named are in fact unindicted alleged coconspirators with the defendants.

Defense counsel, in order to adequately prepare for trial and to effectively confront their clients' accusers at trial, attempted, commencing on June 6, 1994, first by agreement with prosecutors assigned to the case and, next, through Rule 16 discovery proceedings, to ascertain whether the four key state's witnesses had been involved in any previous criminal activities and whether they had been courted by the state with any promises of absolution, immunity, or leniency in return for their cooperation and testimony. The state's response to those simple and direct discovery requests evolved unfortunately into what turned out to be a prosecutorial game of "hide-and-seek" that played out over a two-year period. In the course of playing out that game, certain of the state's prosecutors not only violated their agreement made with defense counsel to furnish that specific pretrial discovery witness information but also repeatedly violated pretrial discovery orders entered by the Court providing for disclosure of that requested witness information. Apparently not content with simply violating their Rule 16 discovery obligations and the trial justice's court orders, the case record further reveals that certain prosecutors, motivated by what appears as unbridled prosecutorial ferocity, then actually lied [5] both to defense counsel and to the trial justice in a frantic attempt to conceal not only their ongoing discovery transgressions but also their own active complicity with two of the state's key witnesses, Brusini and Zaino, in their attempt to cover-up and conceal the previous commission by those two witnesses of crimes such as perjury, state income tax evasion, and the filing of fraudulent documents with the Rhode Island Family Court. That was done so that the

---

**5.** The majority in its review of the case facts has chosen to refer to the prosecutor's repeated lies to defense counsel and the trial justice as conduct that was "less than candid" and to the two-year concealment of the crucial Brusini, Zaino, Piccoli, and Santos information that had to be finally dragged out by the trial justice as simply "delayed discovery." I liken that to describing the Titanic disaster as simply a maritime incident following which the Titanic failed to reach its intended port of destination at the scheduled time of arrival, which, while being technically correct, is factually deficient.

state's prosecutors would then be able to present Brusini and Zaino at trial as "clean" witnesses.

It was not until July 29, 1996, more than two years after the defendants' arraignment, that the iniquitous prosecutorial pretrial discovery chicanery began to unravel and surface. On that date the state's prosecutors, after having been prodded by defense counsel and the trial justice, informed the trial justice that they suddenly found some thirty additional boxes of materials that could be relevant to defense counsel's discovery requests but that ten of those boxes contained what the prosecutors asserted were privileged materials not subject to discovery. The trial justice, by this time understandably skeptical of the prosecutors' assertions, ordered them to produce the ten boxes for his in camera inspection. The prosecutors quickly recanted their privilege assertion and instead offered defense counsel the opportunity to inspect and review the boxed materials, consisting of some 68,000 pages, at the offices of the Department of the Attorney General. When defense counsel looked into the ten boxes, they found there discovery information that had been earlier represented to them, as well as to the trial justice, as either not existing or as having been already disclosed. Defense counsel thereafter on August 26, 1996, convinced that they and the defendants had been the victims of egregious prosecutorial misconduct, filed motions with the trial justice, seeking imposition of Rule 16(i) discovery violation sanctions.

Hearings on the defendants' motions for sanctions commenced on October 21, 1996, and extended over a period of some thirty-two hearing days. Following that extended hearing, the learned and experienced trial justice on March 11, 1997, filed a comprehensive thirty-eight-page decision in which he found that various of the state's prosecutors assigned to prosecute the state's indictment had, over a two-year period of time, deliberately concealed crucial requested pretrial discovery materials that were essential to defense counsel's ability to adequately prepare for trial. He additionally found that during that two-year time period certain of the prosecutors had not been truthful in their dealings with defense counsel, as well as with the court, apparently attempting to conceal the fact that they had withheld requested Rule 16 discovery information from the defendants.[6]

The trial justice additionally found that various prosecutors had intentionally concealed from defense counsel and the court known evidence of past criminal conduct on the part of their four key witnesses as well as evidence of immunity and leniency deals that had been made with those witnesses in return for their cooperation and testimony.

He also found that certain of the state's prosecutors had actually assisted and participated with two of its witnesses (Brusini and Zaino) in a scheme to cover-up past criminal conduct on the part of those witnesses so as to be able to present them at trial as "clean" witnesses. The trial justice then aptly noted that the prosecutors who had actually assisted in the crime cover-up scheme had conceivably not only violated our Rules of Professional Conduct but also engaged in conduct that could be deemed criminal as well and had lied to both defense counsel and the

---

**6.** At the discovery violation hearing, the trial justice determined that of some eighty-nine specific documents concerning background information of the state's key witnesses that had been requested by defense counsel, only *two* had in fact been produced by the state. The state sought to excuse its noncompliance by suggesting that defense counsel could have extracted the sought after documentary discovery materials from other documents that had been furnished to defense counsel.

In responding to that defense, the trial justice noted:

"The State has the temerity to suggest to the court that defendants should have gleaned information contained in the withheld documents from the mass of material that the prosecutors themselves admittedly did not review in its entirety. The prosecution, therefore, could not accurately represent to the court, although they did on several occasions, that defendants were in possession of all exculpatory material. Under the circumstances, given the admissions of prosecutors during the hearing, such a suggestion is specious and further brings into question whether the prosecutors truly understand their responsibilities to a defendant as well as to the court."

court in an attempt to conceal their improper conduct with those witnesses.[7]

I find significant, particularly in light of the Rule 16(i) discovery violation sanction concerned in this appeal, the trial justice's clear and explicit review of the extent and duration of the egregious prosecutorial misconduct that was unearthed and exposed at the sanction hearing and his conclusion therefrom that defendants had been substantively prejudiced by that flagrant prosecutorial misconduct. That conclusion was reached following diligent adherence to the sanction imposition guidelines set out by this Court in *State v. Coelho*, 454 A.2d 241, 244–45 (R.I.1982).

In *Coelho* this Court noted that a trial justice, when determining the appropriate remedy for a violation of Rule 16, must consider "(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." *Id.* at 245. In this case the trial justice diligently considered each of these factors and carefully reviewed all of the contradictory reasons put forth by the state's prosecutors for both their failure to disclose the requisite exculpatory materials and their continued denial of any wrongdoing on their own part. The trial justice considered, noted, and outlined in detail the nature and extent of the prejudice caused to the defendants by the gravity and the duration of the prosecutors' misconduct and concluded that neither a mere trial continuance nor the exclusion of the four key state's witnesses' testimony would serve as an adequate remedy.[8] After painstaking consideration of the hearing evidence and the case travel, the trial justice exercised his discretion and determined that the only appropriate Rule 16(i) sanction that could fairly serve to remedy the prosecutors' misconduct and the resulting prejudice to the defendants was case dismissal. That was clearly his discretionary judg-

ment call to make, and while the majority may disagree with that choice of sanction, mere disagreement can not translate itself into a holding that the trial justice clearly abused his discretion. This Court should not second guess the trial justice on what is a discretionary judgment call simply because the majority might have made a different call. Unless this Court can say that the trial justice clearly abused his discretion, we should not disturb his action.

The case dismissal sanction chosen by the trial justice was selected by him only after he had meticulously complied with every directive that we have made applicable to imposition of Rule 16(i) sanctions. As *Coelho* instructed, the trial justice considered what was "right and equitable under all of the circumstances and the law." Initially he addressed what would be right and equitable under all of the factual circumstances disclosed from the case record and the recently concluded thirty-two day sanction motion hearing.

The hearing evidence disclosed and presented to him a fact scenario that clearly demonstrated a heretofore unparalleled prosecutorial ferocity that appeared unwaveringly hellbent on securing a conviction in a high-profile criminal prosecution reeking of political ramification. That uncontrolled zealousness and prosecutorial misconduct was especially disturbing to the trial justice because it surfaced in the offices of the state's Attorney General, the very office entrusted with protecting the constitutional rights of the citizens of this state. As Justice Sutherland eloquently noted in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the prosecutor

"is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a

---

7. The conduct of the particular prosecutors actually borders on misprision of a felony, a common law crime recognized in this state. *State v. Flynn*, 100 R.I. 520, 217 A.2d 432 (1966).

8. In determining that dismissal was the *only* available remedial sanction capable of curing the substantive prejudice to the defendants that re-

sulted from the prosecutors' misconduct, the trial justice rendered moot the consideration of any lesser remedy and fully complied with the federal case law rule requiring a trial justice, when addressing a discovery violation, to impose the least severe sanction.

criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321.

That special duty of a prosecutor is embodied in our Supreme Court Rules of Professional Conduct, Article V, Rule 3.8. Among the special responsibilities of a prosecutor specifically listed in Rule 3.8(d) is that "[t]he prosecutor in a criminal case shall * * * make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused * * *." In this case the prosecutors utterly failed to abide by that rule of professional conduct.

Accordingly the trial justice in this case was confronted not only by dire facts of prosecutorial misconduct but also by his own sworn obligation to preserve and protect the integrity and credibility of our justice system and the Superior Court Rules of Criminal Procedure, adopted by this Court to "govern all criminal proceedings in this state." Super.R.Crim.P. 59. He commendably recognized that he had before him in this case a societal concern that transcended the apparent prosecutorial self-interest of the state's prosecutors, and he responded to that concern by properly noting:

"[T]he manner and magnitude of the prosecutorial misconduct * * * in this case has not only resulted in substantial prejudice to the defendants but has the effect of eroding confidence in the criminal justice system. Of equal concern is that the situation also raises the alarming specter that the system works only if an accused has the financial resources to make independent investigation prior to trial to ferret out misconduct to ensure due process. At the very least, the court would be justified in precluding the testimony of the witnesses for the State (Brusini, Zaino, Piccoli, and Santos) but that remedy does not effectively respond to the evidence. It does nothing to impress upon the prosecution that it cannot be allowed to benefit from having acted in a manner that is less than constitutional and ethical in the pursuit of convictions."

The trial justice thereafter addressed the second factor consideration included in the *Coelho* directive, namely, his obligation to do what is right and equitable under the *law*. He properly noted, as I do, the intended purpose of Rule 16 in criminal proceedings in this state.

Rule 16 of the Superior Court Rules of Criminal Procedure became effective on September 1, 1972, and, as amended in 1974, had for its intended purpose "to provide for the fullest, reciprocal discovery in criminal cases in the Superior Court * * *."[9] Rule 16 Reporter's Notes to 1974 Amendment. In *State v. Garcia*, 643 A.2d 180 (R.I.1994), this Court said that the purpose of Rule 16 was to "ensure that both parties receive the fullest possible presentation of the facts prior to trial." 643 A.2d at 186 (quoting *State v. Concannon*, 457 A.2d 1350, 1353 (R.I.1983)). We acknowledged later in *State v. Evans*, 668 A.2d 1256, 1259 (R.I.1996), that our Rule 16 was among the most liberal discovery mechanisms in this country and that its intention was to hopefully eliminate unfair surprise and procedural prejudice at trial. *See also State v. Ramos*, 553 A.2d 1059 (R.I. 1989). In *Evans* we also noted that Rule 16 was intended to ensure that every defendant *through pretrial discovery* would be able to

9. Rule 16(i) of the Superior Court Rules of Criminal Procedure provides in its entirety:

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, it may order such party to provide the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material which or testimony of a witness whose identity or statement were not disclosed, or *it may enter such other order as it deems appropriate.*" (Emphasis added.)

adequately prepare for trial. 668 A.2d at 1259 (citing *State v. Scurry*, 636 A.2d 719, 725 (R.I.1994)). In order to ensure that an accused who is by law presumed to be innocent was given every opportunity to prove that innocence, we have held that whenever a defendant requests pretrial discovery, the state's prosecutors are obligated to respond to that request in good faith, fully and candidly, and must disclose all known relevant information encompassed within the defendant's discovery request. *See State v. LaChapelle*, 638 A.2d 525, 530 (R.I.1994); *State v. Darcy*, 442 A.2d 900, 902–03 (R.I.1982). Any failure on the part of the state's prosecutors to respond candidly to their Rule 16 obligations serves to undermine the judicial process. *Ramos*, 553 A.2d at 1067. In particular, and pertinent to the prosecutorial misconduct in this case, we have consistently condemned *untimely* disclosure of requested pretrial discovery information, *Scurry*, 636 A.2d at 725, and have said that when defendants are misled into proceeding to trial unprepared, the basic concepts of due process are violated [10] and "[t]he courts cannot allow the integrity of the criminal system to be undermined by the over zealous prosecutor." *In re Ouimette*, 115 R.I. 169, 175, 342 A.2d 250, 253 (1975).

The majority questions the trial justice's reference to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in assessing the substantial and irreparable pretrial prejudice that he found to have resulted to the defendants as a result of the prosecutors' flagrant disregard of their Rule 16 pretrial discovery obligations. The majority states that "the *Brady* principles have no relevance to pretrial discovery." I disagree with that restricted keyhole view of *Brady*. In *United States v. Polisi*, 416 F.2d 573 (2d Cir.1969), that court aptly noted:

> "The importance of *Brady*, then, is its holding that the concept out of which the constitutional dimension arises in these cases is prejudice to the defendant measured by the effect of the suppression upon defendant's preparation for trial, rather

than its effect upon the jury's verdict." *Id.* at 577.

Several years later our First Circuit's opinion in *United States v. Donatelli*, 484 F.2d 505 (1st Cir.1973), reflected that same *Brady* interpretation. It noted that,

> "[a] defendant in a criminal trial has the right to a fair trial, and as one aspect of this right he must be supplied by the prosecution all evidence which may be materially favorable to him, [citing *Brady*], including evidence which would have a material effect upon trial preparation." *Id.* at 507–08.

Indeed one need only refer to what Justice Shea said in *State v. Coelho, supra*, to challenge the majority's narrow keyhole interpretation of *Brady* in its application to Rule 16 pretrial discovery proceedings. In *Coelho*, writing for a unanimous court, he correctly noted that the true nature of the prejudice that Rule 16 sought to remedy was "to ferret out *procedural*, rather than *substantive*, prejudice." 454 A.2d at 245. He then added, "In determining whether this type of prejudice exists in a given case, the trial justice must determine whether the discovery violation prevented the defendant from properly preparing for trial." *Id. See also The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant*, 74 Yale L.J. 136 (1964). I believe that the trial justice in this case properly referred to *Brady* in determining whether the prosecution's violation of its pretrial discovery obligations so prejudiced the defendants that any conviction following would be inherently infected by that prejudice and predestined for reversal. Any trial thereafter would be nothing but a costly, time-consuming judicial charade at the expense of the taxpayers and would serve only to heap additional prejudice upon the defendants. The majority responds to the trial justice's conclusion that the defendants could never receive a fair trial that could satisfy constitutional standards by claiming that his dismissal interfered "with the public interest in having the guilty brought to book." That

---

**10.** Not to be overlooked in this regard is the fact that on May 13, 1996, long before the Brusini, Zaino, Piccoli, and Santos information was pulled from the prosecution's files, defendants' cases were actually reached for trial. On that day, jury-trial selection began. Fortunately, for reasons not relevant here, that trial was interrupted and continued.

noble pronouncement overlooks first the fact that these defendants are *still* presumed by law to be innocent and, secondly, the majority's statement appears to be strangely reminiscent of the chant heard from spectators in the ancient Roman Coliseum just before the lions were let loose.

Certainly not to be overlooked here is the undeniable fact that the defendants in this case are entitled, by both our State and our Federal Constitutions, not only to a fair trial on the charges made against them but also to a *speedy* trial. Their right to a speedy trial is constitutionally guaranteed because all reasonable judicial authority clearly recognizes that human memories are apt to dim, vary, and/or change with time and can thus adversely impact upon a defendant's right to a fair trial. Certainly no trial can ever be a search for the truth if the trial is delayed to the point where the trial witnesses are unable to accurately recall what the truth is. In that same vein we should not overlook the fact that the defendants here are facing charges some of which date back thirteen years to 1985,[11] and the state, in order to sustain those charges, must rely in great part upon the recollections of its four key witnesses. Defense counsel, recognizing that their clients' rights of confrontation connote something more than simply their right to face those four witnesses, diligently attempted for more than a two-year period of precious pretrial preparation time to learn from the state through pretrial discovery whether those four witnesses had any criminal conduct in their backgrounds and whether the state had made any deals with them in return for their cooperation and testimony. That requested and later court-ordered information was certainly necessary, if not crucial, for defense counsel to have *prior to trial* in order to permit them not only to plan trial strategy but also, and perhaps more importantly, to enable defense counsel to adequately prepare for their cross-examination of those four state's witnesses at trial.

This Court has long recognized that a defendant's right encompassed within the confrontation clause, while fundamentally a trial right and not a constitutionally compelled rule of pretrial discovery, nonetheless should not restrict a defendant's ability to adequately prepare for the cross-examination of the state's trial witnesses.[12] *In re Douglas L.*, 625 A.2d 1357, 1360 (R.I.1993)(citing *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934, 937 (1965)). Indeed two of the majority justices have recently recognized that very fact in their dissent in *State v. Brown*, 709 A.2d 465, 482 (R.I.1998), in noting that "the confrontation clause is fundamentally a trial right and should not be confused with a 'constitutionally compelled rule of pretrial discovery.' * * * Yet the principle will compel a state to produce material when the failure to do so would improperly restrict the types of questions defense counsel may ask during cross-examination. State v. Kelly, 554 A.2d 632, 635 (R.I.1989)." (Emphasis added.) See also *State v. Myers*, 115 R.I. 583, 588, 350 A.2d 611, 613–14 (1976). We have long noted that procedural prejudice is inflicted upon a defendant when his or her defense counsel must proceed to trial unprepared because of the state's noncompliance with its Rule 16 obligations. *State v. Brisson*, 619 A.2d 1099, 1103 (R.I.1993). In *State v. DeAngelis*, 658 A.2d 7 (R.I.1995), we noted that the "'inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Id.* at 12.

The trial justice additionally noted that the defendants had been substantively prejudiced by the state's repeated and continuous refusal to comply with the trial court's discovery orders. The state's misconduct ultimately necessitated a lengthy thirty-two day

---

**11.** In *State v. Wheaton*, 528 A.2d 1109 (R.I.1987), this Court said in dismissing an indictment for lack of speedy trial that had been pending for three years, that "delay that impairs the preparation of a defense causes the most serious form of prejudice" and can prejudice a defendant in other ways such as disrupting his liberty, whether on bail or not, "'drain[ing] his financial resources, * * * subject[ing] him to public obloquy and creat[ing] anxiety in him, his family and friends.'" *Id.* at 1112. In *State v. Austin*, 643 A.2d 798 (R.I.1994), we said that dragging on a criminal prosecution for eighteen months was not acceptable.

**12.** Amendment VI, United States Constitution; article I, section 10, Rhode Island Constitution.

hearing during which defense counsel were required to establish the exact nature and scope of the state's wrongdoing in order to protect their clients' right to a fair trial. During the course of that expensive and protracted hearing on remedial sanctions, defense counsel were required to satisfy the trial justice of the materiality and relevance of the pretrial information that had been withheld by the state. In order to meet that burden, defense counsel were forced to reveal to the state's prosecutors virtually their entire trial strategy. Further, the prosecution gained the unfair advantage of previewing firsthand defense counsel's planned cross-examination of the state's witnesses. The majority places the blame for this prejudice at the feet of defense counsel, saying it resulted from defense counsels' "voluntary" action in seeking remedial sanctions in the first instance. Under that theory a defendant's attorney, believing that the state is withholding material exculpatory evidence, would have to choose between filing a motion to compel and requesting remedial sanctions or proceeding to trial woefully unprepared. No competent attorney would ever accept such a Hobson's choice, and there is no rule of criminal procedure that requires such a choice, despite the majority's unsupported statement that pretrial strategy is not·beyond disclosure. *See* Super.R.Crim.P. 16(d). A criminal defense attorney's mental impressions as to how evidence relates to issues and defenses constitute opinion work product and are especially protected from disclosure by the work product privilege. *United States v. Horn*, 811 F.Supp. 739, 746 (D.N.H.1992). In this case, I believe that the hearing on remedial sanctions, necessitated by the ac-

tions of the prosecution, permitted the state to intrude upon this privileged area and, therefore, significantly prejudiced the defendants.[13]

Indeed I find it unusual that the majority would in effect seek to punish defense counsel for enforcing an order of the state's trial court. That, however, is precisely what the majority does when it blames defense counsel for the prejudice that resulted from the prosecution's illegal and unethical actions. Would the majority fault the unfortunate victim in a medical malpractice case for having elected to seek medical treatment or a bank for electing to have funds available on its premises that the robber could then steal?

What I believe the learned trial justice found most disturbing and damaging of all, however, was the very real possibility that even as of the date of his decision, the defendants may not then have yet received all of the exculpatory materials that had been requested and to which they were entitled. The trial justice actually found that defense counsel at that late time could still not be assured that the prosecution had laid all its cards on the table and was not persuaded by the state's protestations to the contrary because those same protestations had in the past, without exception, been untruthful. The defendants here should not be compelled to walk blindfolded into battle and risk yet another ambush by the prosecution.

I referred earlier to the case record disclosing that for a period in excess of two and one-half years the state's prosecutors had played "hide-and-seek" with the defendants' Rule 16 discovery requests and as well with the trial justice's pretrial discovery orders.[14]

**13.** The United States Supreme Court addressed the role of the work product privilege in criminal prosecutions in *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141, 153–54 (1975), and concluded:

"Although the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital. The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case.

"At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."

**14.** The trial justice in his written decision noted:

"In July 1995, defendants filed motions for disclosure of various materials to which the State objected. The court heard and decided the motions on August 24, 1995, except for the motion for a Bill of Particulars that was decided in part on August 29, 1995. Some of the motions were denied, others were granted *in toto* or in part. Specifically, among other things, this court ordered the State to produce,

In support of that assertion, I submit now as examples just two of the nefarious machinations by various members of the state's prosecutorial team with key state's trial witnesses, Rodney M. Brusini and Frank N. Zaino.

Brusini had testified in March 1992 before a grand jury investigating Joseph Mollicone, Jr. (Mollicone), of Heritage Loan and Investment Company fame. In that grand jury proceeding he testified under oath that he had no ownership interest in a property known as the Rosemac Building located in Providence. At the time Brusini so testified, the state's prosecutors were then in possession of clear evidence establishing that Brusini in fact co-owned the building with Mollicone. In August 1992, some five months later, and while the state was attempting to build its case of criminal wrongdoing against the DiPretes, the state, knowing full well that Brusini could be a key witness against the DiPretes, presented evidence to a new grand jury in an effort to indict Brusini for his past-known perjury. That grand jury proceeding was suddenly halted, but only after Brusini agreed to testify for the prosecution against the defendants.· In exchange, the state agreed not to further pursue the perjury charges arising from Brusini's prior grand jury testimony regarding his ownership interest in the Rosemac Building. That deal is evidenced by the sworn testimony of both former and present members of the prosecution team as well as that of Brusini's own attorney.

Despite those known facts the state continued to repeatedly represent to both the court

with respect to all unindicted coconspirators, the following: a full and complete statement of all promises, rewards, and/or inducements made in order to secure their cooperation in the investigation; a full and complete statement of the State's knowledge of any and all criminal conduct of the unindicted coconspirators, including not only criminal convictions or pending criminal charges but also information on any known criminal conduct, whether or not that conduct had been the subject of a criminal charge; and any other information relating to a coconspirator's credibility as a witness such as prior inconsistent statements, admissions of a poor memory, or evidence of bias on the part of the witness.* * *

and to defense counsel that it had no knowledge of Brusini's having ever committed perjury or of any agreement made by the state with Brusini not to pursue perjury charges against him in exchange for his testimony against the defendants. Even when specifically ordered by the trial justice to produce all of the state's knowledge of Brusini's criminal conduct, the state surreptitiously and cleverly directed the court and defense counsel only to the formal immunity petition given to Brusini. Later, when again specifically ordered by the court to produce all promises, rewards, or inducements offered to Brusini, the state ·once again cleverly directed the court and the defendants to only Brusini's immunity petition. Brusini's immunity petition, however, contained no mention of Brusini's perjured testimony before the grand jury regarding his ownership interest in the Rosemac Building.

The state contends that no misconduct occurred in the withholding of this classically exculpatory and witness impeaching evidence from the defendants and that no prejudice resulted to them as a result of the prosecutors' failure to reveal Brusini's perjury and the resulting nonprosecution agreement that the state had entered into with Brusini. In support of those arguments, the state has advanced several contradictory and incredible assertions.

First, the state asserts that the defendants should have been able to deduce that Brusini committed perjury in front of a grand jury from defense counsel's earlier review of some 600 boxes filled with materials that the state originally had provided to the defendants.

"On November 10, 1995, in response to the defendants' Motion for Exculpatory Evidence, the State represented that the information ordered to be produced in August 1995 either already had been provided or did not exist. In response to the court-ordered production of the State's knowledge of the criminal conduct of its witnesses, as well as a statement of the promises, rewards, and inducements made to its witnesses, the State directed defendants to previously produced immunity petitions and letters of nonprosecution which turned out to be an inadequate, and indeed inaccurate, response." Trial justice's decision, p. 4–5.

None of the trial justice's discovery orders were appealed by the state, thereby requiring compliance by the state with those orders.

The simple response to that assertion is that the trial justice's pretrial discovery order did not provide for the delivery of an avalanche of documents. It specifically directed that the state furnish defense counsel with its specific knowledge of Brusini's criminal conduct. The state's knowledge of Brusini's criminal conduct was not flagged or otherwise clearly identified in the 600 boxes of materials. Rather the state's knowledge was in great part founded upon specific and particular documents contained therein. Defense counsel were left, however, to search for and hopefully find what they had specifically requested. What the state did here in responding to defense counsel's specific discovery requests, we condemned in *State v. Verlaque*, 465 A.2d 207, 214 (R.I.1983).

Next the state denied the existence of any agreement with Brusini to forego prosecution of Brusini for perjury in exchange for his testimony. That assertion, however, was flatly contradicted by J. Richard Ratcliffe (Ratcliffe), a former chief prosecutor on the prosecution team when the deal was made. The state's prosecutors attempted to neutralize Ratcliffe's testimony by contending that the arrangement made between the state and Brusini was merely an "understanding" and not a "deal." This type of semantic obfuscation was typical of the prosecution's posture throughout the pretrial discovery proceedings. The irrefutable fact that surfaces is that the state had made a deal with a known perjurer in order to enlist his aid in convicting the defendants, and the prosecutors then ignored the trial justice's order that specifically directed them to inform the defendants about witness inducements of this type and nature.

Finally, the state's prosecutors went as far as to represent to the trial judge and to defense counsel that there was no chargeable case against Brusini for his perjured grand jury testimony. That argument was perhaps the least plausible and the most ludicrous. In fact the state's very own documents indicated that it knew of at least *ten* separate individuals, all identified by the state prosecution team as reliable witnesses, who were capable of establishing Brusini's ownership interest in the Rosemac Building. Clearly the state knew that Brusini had committed perjury, or it would never have presented that evidence to a grand jury in August of 1992 in an attempt to indict Brusini for that very crime. To reason otherwise, the prosecutors would have to admit that they had abused the grand jury process in order to force Brusini to cooperate in the prosecution of the defendants. In either case one fact becomes clear and that is that the prosecutors were overly zealous in their attempt to ensure that the defendants would not be able to adequately prepare for trial and that as a result their prosecution would be successful.

As to Frank Zaino, another unindicted co-conspirator, it was discovered almost on the eve of scheduled trial that the state's prosecution team had actually assisted Zaino in falsifying tax returns and filing false documents with the Family Court in order to amend and conceal Zaino's previous false filings in an effort to present a "clean" or unimpeachable witness to the jury at the defendants' trial. The prosecution was fully aware that between 1988 and 1990, Zaino had failed to report fraudulently obtained income on his tax returns. In order to correct that blemish and present a "clean" witness to the jury at the defendants' trial, the state actually proceeded to assist Zaino in preparing amended tax returns. The amended tax return filed for tax year 1991 falsely reported income that was earned in previous years. This error was known to the state, but instead of dutifully enforcing the law, certain members of the Attorney General's office chose to assist Zaino in filing these false tax returns with the Internal Revenue Service and the Rhode Island Family Court with regard to his divorce proceeding in that Court.[15]

---

15. That conduct not only constituted deliberate violation of the orders of the Superior Court but also offended the Rules of Professional Conduct. Article V, Rule 8.4 of the Supreme Court Rules of Professional Conduct states in pertinent part, "[I]t is professional misconduct for a lawyer to: * * * (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation." The act of assisting an individual in filing an obviously false document with a court of this state as well as with the United States Internal Revenue Service is a patent violation of this rule.

Despite the state's firsthand knowledge of Zaino's tax fraud and the state's decision to forego any prosecution of Zaino in exchange for his cooperation, the state deliberately failed to produce any information to the defendants regarding Zaino's criminal conduct and deal. Instead the state once again pointed to the immense amount of material contained in the approximately 600 boxes already provided to the defendants and attempted to convince both the court and defense counsel that a competent and hardworking advocate would have been able to deduce that Zaino had lied on his tax returns. Once again the state ignored what this Court said it was obligated to do in *Verlaque,* 465 A.2d at 214.

The state's position that all of the materials withheld from the defendants were somehow actually present in the 600 boxes of materials already provided to defense counsel was later discovered to be not only factually incorrect and false but also totally unresponsive to the trial justice's previous discovery orders. Those orders had specifically directed the prosecution to reveal to defense counsel the state's knowledge of all criminal conduct on the part of any of the unindicted coconspirators whom the state planned to call as witnesses at the defendants' trial. The court's orders were repeatedly and deliberately ignored by the state.

In light of the baneful prosecutorial misconduct found in this case and the resulting substantial and irreparable prejudice inflicted upon the defendants, I am satisfied beyond question that the trial justice, acting pursuant to the authority granted him by Rule 16(i) of the Rules of Criminal Procedure, had not only clear authority but as well, ample justification to select case dismissal as the appropriate Rule 16(i) discovery violation remedial sanction.

The state in its appeal claims that it did no wrong. That of course is the very same claim that comes from every prisoner now confined in the Adult Correctional Institutions. The Court of Appeals for the Ninth Circuit addressed a similar contention in

*United States v. Kojayan,* 8 F.3d 1315 (9th Cir.1993); it stated,

"What we find most troubling about this case is not the [prosecutor's] initial transgression, but that he seemed to be totally unaware he'd done anything at all wrong, and that there was no one in the [prosecutor's] office to set him straight. Nor does the government's considered response, filed after we pointed out the problem, inspire our confidence that this kind of thing won't happen again." *Id.* at 1324.

"In a situation like this, the judiciary—especially the court before which the primary misbehavior took place—may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was more serious still and that steps must be taken to avoid a recurrence of this chain of events." *Id.* at 1325.

In this case the state's failure to even acknowledge any wrongdoing on its part lends further support for the trial justice's choice of remedial sanction.

I fear that if on the egregious facts present in this case and the findings of fact made by the trial justice witness exclusion and case dismissal sanctions are not authorized, the message the majority's holding sends out to all prosecutors in this state is that they can continue hereafter to ignore Rule 16 pretrial discovery obligations, violate court discovery orders, and play "hide-and-seek" with defense counsel. If not caught, no one will ever know. If caught, the only remedial Rule 16(i) penalty that can be imposed, according to the majority's holding, will be a case continuance—which in effect simply means that the prosecutor's game clock will have to be rewound and reset and the game replayed.

## II

**Proper Scope of Review in This Appeal**

In every reported opinion of this Court since 1972 wherein we have reviewed a challenge to the propriety of a trial justice's imposition of a Rule 16(i) sanction,[16] this Court has always and unanimously held that

---

16. The Superior Court Rules of Criminal Procedure became effective September 1, 1972.

the imposition of any sanction " 'is a matter addressed to the sound discretion of the trial justice' " in light of the attendant circumstances of a given case and that "[w]e will not disturb a trial justice's action in this regard absent a clear showing that the trial justice abused his or her discretion." *State v. Quintal,* 479 A.2d 117, 119 (R.I.1984); *Coelho,* 454 A.2d at 245.[17] We additionally noted in *Coelho* that "[w]ithout question, the trial justice is in the best position to determine whether any harm has resulted from noncompliance with discovery motions and whether the harm can be mitigated." *Coelho,* 454 A.2d at 244–45.

The only issue thus raised by the state's appeal in this case and properly before us is whether the state has proven that the trial justice in this case clearly abused his discretion in imposing the Rule 16(i) discovery sanction of case dismissal. We have never held otherwise. *State v. Gomes,* 690 A.2d 310, 319 (R.I.1997); *State v. Garcia,* 643 A.2d 180, 186 (R.I.1994); *State v. LaChapelle,* 638 A.2d 525, 530 (R.I.1994); *State v. Squillante* 622 A.2d 474, 478 (R.I.1993); *State v. Brisson,* 619 A.2d 1099, 1102 (R.I.1993); *State v. Amaral,* 611 A.2d 380, 383 (R.I.1992); *State v. Sanders,* 609 A.2d 963, 965 (R.I.1992); *State v. Morejon,* 603 A.2d 730, 735 (R.I. 1992); *State v. O'Dell,* 576 A.2d 425, 430 (R.I.1990); *State v. Parker,* 566 A.2d 1294, 1297 (R.I.1989); *State v. Bibee,* 559 A.2d 618, 621 (R.I.1989); *State v. St. Jean,* 554 A.2d 206, 210 (R.I.1989); *State v. Ramos,* 553 A.2d 1059, 1068 (R.I.1989); *State v. Padula,* 551 A.2d 687, 690 (R.I.1988); *State v. Boucher,* 542 A.2d 236, 241 (R.I.1988); *State v. Dufault,* 540 A.2d 355, 358 (R.I.1988); *State v. Brown,* 528 A.2d 1098, 1102 (R.I.1987); *State v. Payano,* 528 A.2d 721, 728 (R.I.1987); *State v. Robbio,* 526 A.2d 509, 512 (R.I.1987); *State v. Lawrence,* 492 A.2d 147, 149 (R.I. 1985); *State v. Engram,* 479 A.2d 716, 718–19 (R.I.1984); *State v. Quintal,* 479 A.2d 117, 119 (R.I.1984); *State v. Verlaque,* 465 A.2d

207, 213 (R.I.1983); *State v. Tillinghast,* 465 A.2d 191, 197 (R.I.1983); *State v. Concannon,* 457 A.2d 1350, 1353 (R.I.1983); *State v. Coelho,* 454 A.2d 241, 245 (R.I.1982); *State v. Sciarra,* 448 A.2d 1215, 1218 (R.I.1982); *State v. Darcy,* 442 A.2d 900, 902 (R.I.1982); *State v. Silva,* 118 R.I. 408, 411, 374 A.2d 106, 108 (1977).

The majority today in this appeal, however, elects to avoid and sidestep that longstanding precedent and deftly relieves the state of its burden of proving a clear abuse of discretion on the part of the trial justice. Abandoning precedent, the majority announces that it has chosen not to "test" the trial justice's action in this appeal under an abuse of discretion standard but instead under a lack of authority standard, from which it then concludes "that the trial justice did not have the authority to dismiss" the indictment nor the authority to even impose a witness exclusion sanction.[18] In employing that new appellate standard of review, the majority explains that in doing so, the trial justice's discretion is "not called into action." It then attempts to justify its new rule in a somewhat interesting, double-faceted manner that unfortunately, I believe, is infected by inherent misconception. Initially the majority appears to premise its "lack of authority" or "no authority" rule upon the suggested absence of any federal or state case precedent that has approved the dismissal of a criminal prosecution for prosecutorial misconduct during pretrial discovery proceedings. In so doing, it seizes upon language contained in several cited Ninth Circuit opinions that refer to a case dismissal sanction for violation of pretrial discovery as being "drastic" and "disfavored."[19] The majority, however, overlooks that in those very same Ninth Circuit cases, the case holdings specifically recognize that case dismissal would be a proper and authorized discovery violation remedial sanction in a case in which both fla-

---

17. In the federal courts, the imposition of Rule 16 sanctions is also reviewed under an abuse of discretion standard. *See, e.g., United States v. Tibesar,* 894 F.2d 317, 319 (8th Cir.), *cert. denied,* 498 U.S. 825, 111 S.Ct. 79, 112 L.Ed.2d 52 (1990).

18. In *State v. Joseph DiPrete,* 468 A.2d 262, 264 (R.I.1983), this Court expressly found that exclu-

sion of a trial witness "as a sanction for failure to comply with discovery is within the sound discretion of the trial court and should not be overturned absent a clear abuse of that discretion."

19. We have repeatedly used those very same words in describing summary judgment case dismissals on the civil side, but yet have repeatedly approved such dismissals.

grant prosecutorial misconduct and substantial prejudice to the defendant are present. *See, e.g., United States v. Jacobs,* 855 F.2d 652, 655 (9th Cir.1988) (citing *United States v. Rogers,* 751 F.2d 1074, 1076–77 (9th Cir. 1985)), and *United States v. Carrasco,* 786 F.2d 1452, 1455 (9th Cir.1986). In *Jacobs* the court there noted that "[a] dismissal rooted in a failure to obey a discovery order lies within a court's supervisory powers" and "that this court [9th Circuit Court of Appeals] recognized supervisory power to dismiss for violation of discovery orders." *Jacobs,* 855 F.2d at 655. It should be noted that in this case the trial justice specifically found both flagrant prosecutorial misconduct as well as irreparable and substantial prejudice resulting therefrom to the defendants to be present.

Accordingly the majority's suggestion that case dismissal was not a permitted Rule 16(i) sanction simply because there is no reported federal court precedent that has yet upheld case dismissal as an appropriate Rule 16 discovery violation sanction is not correct. A District Court may properly dismiss an indictment if the prosecutorial misconduct (1) was flagrant, *Carrasco,* 786 F.2d at 1455, and (2) caused substantial prejudice to the defendant, *Rogers,* 751 F.2d at 1077. Federal case law thus clearly recognizes the existence of case dismissal as an appropriate sanction but simply limits its application to those cases that involve flagrant prosecutorial discovery misconduct with resulting substantial prejudice to a defendant, such as was found in this case. *United States v. Manthei,* 979 F.2d 124, 126 (8th Cir.1992).

It should also be noted that the federal courts follow *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In doing so, they employ an outcome determinative approach that focuses on the impact of discovery nondisclosure upon the trial outcome. In that approach the federal courts consider the reason for the government's delay in producing requested pretrial discovery information including (1) whether noncompliance was intentional or in bad faith, (2) the degree of prejudice to the defendant, and (3) whether the prejudice to the defendant can be cured with a less severe

sanction such as granting a case continuance. *See United States v. Mavrokordatos,* 933 F.2d 843, 847–48 (10th Cir.1991); *United States v. Wolak,* 923 F.2d 1193, 1196–97 (6th Cir.), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991); *United States v. Glover,* 846 F.2d 339, 342 (6th Cir.), *cert. denied,* 488 U.S. 982, 109 S.Ct. 533, 102 L.Ed.2d 565 (1988); *United States v. Euceda–Hernandez,* 768 F.2d 1307, 1312 (11th Cir.1985). We have opted to employ a similar yet different approach, namely, a sliding-scale approach based on the blame-worthiness of the prosecution in failing to furnish and disclose requested or court ordered pretrial discovery to a defendant. *Brisson,* 619 A.2d at 1102. Unlike the *Bagley* outcome-result approach, we permit pretrial nondisclosure that prevents a defendant from being able to adequately prepare for trial to be considered by the trial justice in deciding which of the Rule 16(i) sanctions will most appropriately remedy the nondisclosure discovery violation. The trial justice in this case correctly applied our sliding-scale analysis approach as well as our directive set out in *Coelho* and determined that only case dismissal was the appropriate sanction. His doing so was faultless.

I suggest, without fear of contradiction, that if any federal court had ever been confronted by the egregious and flagrant discovery violations coupled with the prosecutorial misconduct and the resulting prejudice to the defendant that is present in this case, there would most certainly now be federal precedent available to cite in support of the discovery violation sanction imposed by the trial justice in this case. *See, e.g., Manthei,* 979 F.2d at 127–30 (McMillian, J., dissenting).

In any event I do not find that simply because no federal appellate court has yet been confronted by the degree of prosecutorial misconduct present in this case and been called upon to uphold the pretrial dismissal of an indictment for prosecutorial misconduct and violation of pretrial discovery orders means that a Rule 16(i) case dismissal sanction is not permitted. I do not believe that a trial justice's discretionary act requires precedential support in order for this Court to afford it the requisite appellate deference.

Rather, I believe that the distinctive circumstances of a single case may call for a singular resolution. As Justice Cardozo wrote:

"[Some judges'] notion of their duty is to match the colors of the case at hand against the colors of many sample cases spread out upon their desk. The sample nearest in shade supplies the applicable rule * * *. If that were all there was to our calling, there would be little of intellectual interest about it. The man who had the best card index of the cases would also be the wisest judge. It is when the colors do not match, when the references in the index fail, when there is no decisive precedent, that the serious business of the judge begins." Benjamin N. Cardozo, *The Nature of the Judicial Process*, 20–21 (1921).

I believe that the colors in this case do not exactly match any previous one. Therefore, the proper judicial response is not necessarily one that is dependent upon the existence of past precedent, federal or otherwise. Indeed, perhaps we have not had a previous pretrial case dismissal of this variety before us because no defendant has yet been able to uncover such a degree of deceit and trickery on the state's part until now, in this case. Nonetheless, this Court has recognized and acknowledged case dismissal as an available Rule 16(i) discovery violation sanction. *See State v. Rawlinson*, 526 A.2d 1278 (R.I.1987); *State v. Quintal*, 479 A.2d 117 (R.I.1984). Other state courts have done likewise. *See, e.g., Commonwealth v. Hernandez*, 421 Mass. 272, 656 N.E.2d 1237 (1995); *Mathis v. State*, 112 N.M. 744, 819 P.2d 1302 (1991); *State ex rel. Rusen v. Hill*, 193 W.Va. 133, 454 S.E.2d 427 (1994).

The majority erroneously asserts that "in all the Rhode Island cases cited by the state and by defendant save one" (*State v. Quintal*), this Court has never recognized or approved the pretrial dismissal of a criminal case because of a Rule 16 discovery violation. The majority, proceeding from that premise, then faults the trial justice for relying upon *Quintal*, reasoning that *Quintal* was clearly distinguishable from this case because *Quintal* was based upon a self-executing order of dismissal that had been previously entered in that case. The majority obviously overlooks

what this Court said and did in *State v. Rawlinson*, decided shortly after *Quintal.* In *Rawlinson*, this Court had before it the question of whether or not the pretrial dismissal of a criminal information because of the state's failure to provide discovery precluded the state from filing a second information upon the same alleged charges. This Court on October 16, 1986 entered an order as follows:

"This case came before the court for oral argument on October 9, 1986 pursuant to an order which directed the state and the defendant to appear before this court in order to argue the question whether the information presently pending on appeal should not have been dismissed as a result of the dismissal of a preceding information covering the same subject matter by reason of the repeated unexcused failure of the prosecution to make discovery in accordance with Rule 16 of the Superior Court Rules of Criminal Procedure.

After examining the pre-briefing statements and supplemental memoranda filed by the parties and hearing the arguments of counsel, the following order may enter:

1. *The court is of the opinion that the trial justice had ample authority to dismiss the original information with prejudice in light of the persistent failure of the prosecution to make discovery.* However, the trial justice did not specifically state whether he was dismissing the information with prejudice or otherwise. Subsequent to the filing of the second information, the defendant moved to dismiss on a number of grounds. Although the trial justice denied the motion to dismiss, he did not specifically decide whether he had dismissed the first information with prejudice.

2. Consequently, this case shall be remanded to the trial justice for the purpose of deciding specifically the question of whether he dismissed the first information with prejudice or otherwise.

Entered as an Order of this Court this 16th day of October, 1986." (Emphasis added.) *State v. Rawlinson*, No. 85–261–C.A. (R.I., order filed October 16, 1986).

Following the entry of that order, the trial justice in that case responded to this Court's

remand order and stated that his pretrial dismissal had been intended to be with prejudice. This Court, thereafter, based solely upon the propriety and validity of the trial justice's earlier pretrial case dismissal, vacated Rawlinson's later jury trial conviction and his twenty-five year prison sentence.

Accordingly, the majority's position that this Court has never upheld the pretrial dismissal of a criminal case because of the state's failure to comply with a Rule 16 discovery order in the absence of a previous self-executing conditional order of dismissal is simply unfounded. This Court, at a time when each member of the majority was sitting, did so, less than two years after *Quintal* was decided. The majority in a footnote response to my dissent attempts to rescue itself from the paradoxical dilemma in which it now finds itself after having been confronted by its previous order entered in *Rawlinson* on October 16, 1986. *State v. Rawlinson*, No. 85–261–C.A. (R.I., order filed October 16, 1986). In that order, the majority pronounced as the "opinion" of the members of this Court that a trial justice had ample authority to dismiss, pretrial, a criminal proceeding "with prejudice" because of the prosecution's failure to provide discovery. In this case, on much stronger facts, including deliberate prosecutorial misconduct, the majority pronounces the opposite and seeks to justify the resulting contradiction by simply disclaiming and distancing itself from its earlier proclamation on the basis that what it then said to be the law was contained in an unpublished order. Never before, however, has this Court ever suggested that there is a difference in the validity and effect of a published versus unpublished order entered by this Court in disposing of an appellate proceeding before us.

The majority in its footnote response additionally states that in *Rawlinson* the "sole question before us at that time was whether the initial information had been dismissed with prejudice." That is not quite accurate. In fact, the sole question in that appeal was described by *Rawlinson's* appellate counsel as "this case raises the viability of dismissal as a discovery sanction." Indeed, the state in its *Rawlinson* prebriefing statement also recognized case dismissal as a discovery sanction as the centerpiece of *Rawlinson's* appeal.

The state's position at that time, however, regarding the authority of a trial justice to dismiss a criminal prosecution, pretrial, as an appropriate Rule 16 discovery violation sanction, was completely contrary to the state's position in this case. I quote in pertinent part from the state's prebriefing statement in *Rawlinson*.

"In this case the defendant claims that a Superior Court Justice lacks the discretion to order non-prejudicial dismissal as a sanction for the State's failure to comply with discovery. The State submits that Rule 16 confers extremely broad discretion on the justice and that the judge in this case properly exercised that discretion.
\* \* \*

"Absent a demonstrated abuse of discretion, this court on appeal will not overturn the ruling of the trial justice. *Verlaque, supra.*
\* \* \*

"The State agrees with the defendant's contention that there is little precedent with regard to the issue presented by this case. Nevertheless, an examination of the case law does reveal that a court has the discretionary power to order dismissal with or without prejudice, depending on the circumstances of the particular case. The United States Court of Appeals for the Fifth Circuit has held that, absent a showing of prejudice by the defendant, a with-prejudice dismissal is outside the power of the court. *United States v. Campagnuolo*, 592 F.2d 852, 865 (5th Cir.1979).
\* \* \*

"In a more recent case from the District of Maryland, the court found numerous acts of misconduct by the government and its agents. *United States v. Omni International Corp.*, 634 F.Supp. 1414 (D.Md. 1986). The *Omni* case is a virtual catalogue of prosecutorial misconduct. The District Court found that during the preparation of the case, the prosecution and its agents had altered documents, given false testimony, and displayed an alarming lack

of candor during colloquies with the court. On such a record, the court reasoned, dismissal of the indictment was an appropriate sanction for the government's abusive behavior. Because of the serious violations of the defendants' rights, the court reasoned that they should not be brought to trial on the tainted charges against them.

\* \* \*

"In the instant case, defendant contends that dismissal for a discovery violation must always be with prejudice. Defendant thus seeks to limit the discretion conferred in Rule 16(i) by eliminating non-prejudicial dismissal as an available discovery sanction. In this case, however, the trial justice declined to impose a sanction of dismissal with prejudice upon the State. In light of the extremely broad range or remedies available under Rule 16, the State suggests that defendant's position is unrealistic. Defendant theorizes that the State suffers nothing with a non-prejudicial dismissal, and that the sanction is therefore of little force. Defendant's position misses the mark for two reasons. First, discovery is not a game; it is a procedure for assuring an accurate and fair result at trial. [*State v.*] *McParlin, supra [*422 A.2d 742 (R.I.1980)*].* The point of a sanction, therefore, is not to inflict injury on the disobedient party. Rather, discovery sanctions are designed to advance the goal of accuracy and fairness. Moreover, non-prejudicial dismissal is not as painless for the State as defendant implies. The State recognizes that these different types of dismissal having varying effects upon the case. In exercising the discretion described in *Coelho,* of course, a trial justice is free to consider the relative severity of prejudicial and non-prejudicial

dismissal in choosing a discovery sanction. The mere fact that one sanction is more severe should not be a justification for obliterating the lesser sanction from the range of options available to the court." [20]

The majority, it appears, also seeks to neutralize and defuse *Quintal* by distinguishing it from this case because of the self-executing conditional dismissal order present in *Quintal.* When *Quintal* and *Rawlinson* stand side by side, however, the distinction sought to be made by the majority then becomes a distinction without a difference. The validity and judicial integrity of any court order, once entered by the court, is in no way thereafter conditioned upon anything other than counsel's complete compliance with, and obedience to, the order. Whether counsel agrees with the order, tacitly or otherwise, becomes inconsequential. As correctly noted by defense counsel during oral argument before this Court, for this Court to afford a self-executing order of dismissal, such as the one in *Quintal,* preferential treatment to the order of dismissal found here in this case would actually serve to reward the state's prosecutors for their deceit and untruthfulness. I agree. A court order, even when prepared by the parties, once entered by the court, becomes the order of the court, not of the parties, and must be complied with and respected. "A court order, once issued, must be obeyed, or our system of justice evolves into a system of injustice." *Brisson,* 619 A.2d at 1103.

The majority additionally attempts to explain and justify its new "no authority" rule by extracting what it calls a directive from its three-page opinion review of various federal cases it candidly admits are all "distinguishable on their facts \* \* \* from the case at

---

**20.** I certainly derive no sense of justification for my dissent from the unusual self-contradicting position that the majority now finds itself in as a result of its earlier order in *Rawlinson.* However, I firmly believe that the earlier pronouncement by this Court in that case, which was said to represent the opinion of the members of this Court on a question concerning the legal interpretation of one of the more important rules of Superior Court procedure, should not be lightly cast aside and referred to as a "weak reed" simply because it was pronounced in an unpublished order. This Court's previous order in *Rawlinson,* while now seemingly a "weak reed" to my colleagues in the majority, served to free a convicted felon from a twenty-five year prison sentence following his conviction on serious felony charges after a fourteen-day jury trial in the Superior Court. I believe that even my colleagues would have to admit that to be quite an accomplishment for a "weak reed."

bar." [21] The apocryphal directive from those federal cases that the majority announces and introduces in this appeal is said to be "that a trial justice's supervisory power cannot create new rules of exclusion or dismissal in the absence of a constitutional or statutory basis for such a ruling."

I am perplexed by the majority's reference to that purported federal directive because of its obvious lack of relevance to the appellate issue presently before us in this appeal.[22] The trial justice in this case has never created any new case dismissal rule, and in fact no one but the majority suggests that he did. The basic fallacy inherent in the majority's introduction of that purported federal directive into this case apparently stems from its belief that there is an absence of any *statutory basis* for the trial justice's sanction dismissal order, and thus the asserted federal directive becomes applicable in this case. In that regard I submit that the majority either overlooks or ignores the existence of the unquestionable statutory authority that supports the trial justice's dismissal order in this case and which is readily found in Rule 16(i) of our Superior Court Rules of Criminal Procedure. That rule, proposed by the justices of the Superior Court in April 1972 and later approved by this Supreme Court, became effective on September 1, 1972. On that date Rule 16 assumed the same force and effect as any statute duly enacted by the General Assembly. The General Assembly not only said that in G.L.1956 § 8–6–4 but also added in § 8–6–2 that a Superior Court rule, such as Rule 16, once approved by this Court "shall supersede any statutory regulation in conflict therewith." In *Letendre v. Rhode Island Hospital Trust Co.*, 74 R.I. 276, 281, 60 A.2d 471, 474 (1948), this Court held that a rule of court adopted pursuant to § 8–6–2 must be "given the same force and effect as a statute." Accordingly Rule 16 provides whatever statutory authority the majority believed was lacking to support the trial justice's supervisory authority in this case.

I therefore conclude that there is no recognized precedential support for my colleagues new "no authority" or "lack of authority" appellate rule that has been introduced and employed in this appeal. Unlike my colleagues I do not believe that a Superior Court trial justice is just a "passive bystander in the arena of justice," or "a spectator at a 'sporting event'" but rather that "he or she has the most pressing affirmative responsibility" and authority to ensure that justice is done in every case, according to the Superior Court Rules of Criminal Procedure and constitutional due process guarantees. *United States v. McCord*, 509 F.2d 334, 347 (D.C.Cir. 1974). *See also Brennan, The Criminal Prosecution; Sporting Event or Quest for Truth?*, 1963 Wash.U.L.Q. 279. As Justice Frankfurter said in *Johnson v. United States*, 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468, 475 (1948), "[J]udges are not referees at prize-fights but functionaries of justice." In that regard the trial justice in this case to whom the case had been specially assigned for trial possessed the inherent authority to supervise and regulate the pretrial discovery proceedings undertaken by the parties in the case pursuant to Rule 16. In addition and correlative to that inherent authority, I believe the trial justice possessed supervisory power to vindicate that authority by appropriate sanction imposed pursuant to Rule 16(i). The majority at first blush appears to acknowledge that inherent authority and supervisory power but then proceeds to whittle away that acknowledgment by the introduction of its "no-authority" and "federal directive" rules, suggesting that both serve to restrict a trial justice's supervisory authority and power.

Because I find no recognized precedential authority to support the majority's "no authority" or "lack of authority" appellate scope of review in this appeal, it appears to me

**21.** I would be more direct in my assessment of the relevance of those federal cases to this case and simply say that they are all about as relevant to the issue before us in this appeal as would be *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

**22.** Even if the majority's suggested supervisory rule position was relevant and applicable here, the trial justice's action would still only be reviewable under an abuse of discretion standard that the majority has abandoned in this appeal. *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir.1988).

then to have been fashioned apparently only for this particular appeal. Accordingly, I persist in my belief that the only appellate issue properly before us in this appeal remains as it has always been, namely, whether the state has proven a clear abuse of discretion on the part of the trial justice in this case in his selection of case dismissal as the only proper sanction considered by him to be adequate to remedy the prosecution's flagrant prosecutorial pretrial discovery misconduct and the state's repeated violation of his court discovery orders.

Although the state in its appeal has claimed that the trial justice abused his discretion, not even my colleagues in the majority believe that to be so, because if they did, they would have said so in their opinion. At no point in their opinion do they find that the trial justice abused his discretion. How then do I reconcile their reversal of the trial justice's discretionary Rule 16(i) case dismissal sanction order when reviewed in light of the trial justice's findings of fact? I cannot, and I venture to suggest that neither can they. I believe it was for that very reason that they abandoned what has always been the only proper scope of our appellate review in appeals challenging a trial justice's imposition of a Rule 16(i) discovery violation sanction and elected in its place to fashion their new and unprecedented "no authority" or "lack of authority" rule of appellate review just for this particular case.

I am convinced from my review of the record facts before us that the state has failed to show any abuse of discretion on the part of the trial justice and has failed to meet its appellate burden of proof. I would deny and dismiss the state's appeal and affirm the trial justice's discretionary action. I am equally convinced that if my colleagues in the majority had considered this appeal in accordance with the long-standing abuse of discretion standard that has been applied in every previous appeal challenging a trial justice's imposition of sanctions pursuant to Rule 16(i), they too would have denied and dismissed the state's appeal.

Unfortunately my colleagues in the majority have abandoned that precedent, and in so doing, one is left to surmise that perhaps adherence to precedent would not have permitted the desired end in this case, and, therefore, precedent was sacrificed on the altar of expediency. As Oliver Wendell Homes wrote in dissent in *Northern Securities Co. v. United States*, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904):

> "Great cases, like hard cases, make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." 193 U.S. at 400–01, 24 S.Ct. at 468, 48 L.Ed. at 726.

The "great case" now before this Court should not have persuaded the majority to abandon our well-established standard of review upon which trial justices and litigants alike have come to rely and depend. Rather we should all stand firm and apply the law evenhandedly regardless of who stands at the bar of justice before us and of the vagaries of public sentiment.